R. D. LOWRANCE, INC., A CORPORATION, APPELLEE, V. JAMES E. PETERSON, APPELLANT.

178 N. W. 2d 277

Filed June 26, 1970. No. 37389.

McGinley, Lane, Mueller, Shanahan & McQuillan, for appellant.

Gregory J. Beal and Frederick E. Wanek, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

Defendant James E. Peterson purchased from plaintiff feeder heifers that developed infectious bovine rhinotracheitis ("IBR" or red nose) at some time. Peterson counterclaimed for breach of implied warranties of merchantability and fitness. Plaintiff contended that Peterson, having accepted the heifers after inspection, had excluded the warranties under a usage of the trade.

On the counterclaim a jury allowed only $526.40, the value of four head that Peterson had refused to accept. Peterson appeals. He attacks chiefly jury instructions and evidentiary rulings concerning trade usage on the ground it violated public health regulations.

Peterson, a North Platte pharmacist, owned and operated a commercial feedlot at Big Springs. He authorized William Shannon, head cattle buyer for John Morrell and Company at Ottumwa, Iowa, to purchase for Peterson cattle suitable for the feedlot. Shannon placed the order orally with Robert D. Lowrance, president of plaintiff. Lowrance filled the order by purchasing yearling heifers at sale barns in Maryville, Missouri. The health of each head at the sale was certified by Dr. Edward Powell, deputy state veterinarian of Missouri.

Lowrance hired a trucking company to transport the heifers without rest to Big Springs, 440 miles away. He

watched the loading of the trailers, timely notifying Peterson's agent of each departure. Lowrance's commission charge was $0.25 cwt. Pertinent data are as follows:

| Delivery Date (Jan. 1968) | Quantity | Weight | Cost | Commission Charged |
|---|---|---|---|---|
| 7 | 67 | 41,665 | $ 9,169.50 | $104.16 |
| 14 | 140 | 81,150 | 17,650.03 | 202.88 |
| 28 | 141 | 85,795 | 19,074.09 | 214.49 |

The controversy concerns the heifers delivered in two truck-trailers on January 14. At Big Springs neither trucker noticed a diseased animal. After inspection Joseph Ringleman, manager of the feedlot and accepter of the January 7th delivery, rejected four head. One had lumpy jaw. Three were depressed and feverish. Ringleman within his authority accepted the remainder with the notation "in good order."

On January 15 three head died. Many were sick. Ringleman observed stringing mucus and drooping heads and ears. He administered mostly antibiotics to 60 head. The next day three more head were dead. On January 18 Dr. Darlan Rezac first examined the animals. He approved Ringleman's treatment. His diagnosis of IBR is undisputed. In August the death toll ended with 81 head. IBR ordinarily is not a killer in that proper treatment limits loss to 2 percent.

Clinical signs of IBR are gauntness, fever, cough, polypnea, and mucus stringing from nostrils. Necropses by Dr. Rezac revealed typical lesions of red noses, exudates in tracheae, and lesions in upper respiratory tracts.

In Dr. Powell's opinion the incidence of IBR was high in the Middle West and higher in Maryville than in localities farther north. No clinical signs of IBR appeared during his inspections at Maryville. One day to several months after exposure may elapse before clinical signs develop. Dr. Rezac, on the other hand, estimated the period to be within a few days or a week, depending

on stress. In normal practice the cattle are vaccinated at the feedlot at once, according to Dr. Powell, or after a rest, according to Dr. Rezac.

There is sufficient evidence of this usage in the trade: The buyer after inspection cuts out cattle that do not suit him, and his acceptance of cattle is irrevocable and without recourse.

Health regulations promulgated by the Nebraska Department of Agriculture provide: "No animal . . . that is affected with or exposed to any infectious . . . disease . . . shall be . . . transported into . . . Nebraska." Statutes provide: "It shall be unlawful for any person to knowingly . . . sell . . . any domestic animal . . . affected with an infectious . . . disease, except as provided by sections 54-701 to 54-753, and the . . . regulations prescribed by the Department of Agriculture. . . . Any person so offending shall be deemed guilty of a misdemeanor . . . ." § 54-750, R. R. S. 1943. "It shall be unlawful for any person to violate any . . . regulation . . . promulgated by the Department . . . pursuant to authority granted by sections 54-701 to 54-753, and any person so offending shall be deemed guilty of a misdemeanor . . . ." § 54-751, R. R. S. 1943. The statute in our opinion requires interpolation of the word "knowingly" into the administrative regulation.

The meaning of the word "knowingly" in a criminal statute varies in the context. It commonly imports a perception of facts requisite to make up crime. See Johnson v. Chilson, 29 Neb. 301, 45 N. W. 462 (1890). See, also, Black's Law Dictionary, "Knowingly," p. 1012 (4th Ed., 1951); cf. A. L. I. Model Penal Code, §§ 2.02 (2) (b) and 2.02 (7), pp. 25 and 27 (Proposed Off. Dr., 1962). That meaning applies here. The district court correctly refused Peterson's requested instruction No. 9 relating to exercise of reasonable care and knowledge.

Peterson contends that the usage violated the Uniform Commercial Code without reference to section 2-302, U. C. C., on unconscionability. The contention is without

merit. ". . . an implied warranty can . . . be excluded or modified by . . . usage of trade." § 2-316 (3) (c), U. C. C.

The judgment is affirmed.

AFFIRMED.