349 N.W.2d 870 (1984)
217 Neb. 511
STATE of Nebraska, Plaintiff,
v.
Paul L. DOUGLAS, Attorney General of the State of Nebraska, Defendant.
No. 84-199.
Supreme Court of Nebraska.
May 4, 1984.
*873 Jerome Warner and Vard R. Johnson, Lexington, for managers.
Richard G. Kopf, Lexington, and Wesley C. Mues and Graten Beavers, Sp. Asst. Attys. Gen., Kearney, for plaintiff.
William E. Morrow, Jr., Thomas J. Culhane and Tamra Lin Wilson of Erickson & Sederstrom, P.C., Judy K. Hoffman, Omaha, and Murray Ogborn of Nelson & Harding, Lincoln, for defendant.
BOSLAUGH, C.J. Pro Tem., HASTINGS, SHANAHAN, and GRANT, JJ., MORAN and HOWARD, District Judges, and COLWELL, District Judge, Retired.
PER CURIAM.
On March 14, 1984, the Eighty-eighth Legislature, Second Session, adopted articles of impeachment against Paul L. Douglas, the Attorney General of Nebraska, by Legislative Resolution 277. A copy of the resolution was delivered to the Chief Justice of this court on March 15, 1984.
Pursuant to Neb. Const. art. III, § 17, a special session of this court was called to try the articles of impeachment. A pretrial conference was held in chambers on March 21, 1984. Douglas entered a plea of not guilty on March 26, 1984, and trial commenced *874 on that day. Trial was concluded on March 29, 1984, and the matter taken under advisement. The parties were given 7 days to submit briefs.
The articles of impeachment against Paul L. Douglas consist of some 30 paragraphs of general allegations, followed by 6 specifications, or counts, each of which charge a specific offense.
Neb. Const. art. III, § 17, provides in part, "No person shall be convicted without the concurrence of two-thirds of the members of the Court of impeachment...." The effect of this provision is to require the concurrence of five or more judges to convict on any specification.
The court is divided on specifications Nos. 1 and 2. On specification No. 1, Judge Hastings, Judge Shanahan, Judge Grant, and Judge Moran vote to find the defendant guilty. Judge Boslaugh, Judge Howard, and Judge Colwell vote to find the defendant not guilty.
On specification No. 2, Judge Shanahan, Judge Grant, and Judge Moran vote to find the defendant guilty. Judge Boslaugh, Judge Hastings, Judge Howard, and Judge Colwell vote to find the defendant not guilty.
On specifications Nos. 3, 4, 5, and 6, the court is unanimous in finding the defendant not guilty.
Since there was not a concurrence of five or more judges to find the defendant guilty on any specification, it is the judgment of the court that the defendant is not guilty. The defendant, however, is subject to "prosecution and punishment according to law," and, as a member of the bar, may be subjected to sanctions which may be imposed in a disciplinary proceeding.
Under the Constitution of 1866 an impeachment was tried by the Senate in a political proceeding. Neb. Const. art. II, § 28. The Constitution of 1875 changed this procedure by providing that an impeachment should be tried by the Supreme Court. Neb. Const. art. III, § 14. This provision of the Constitution remains in force today. Neb. Const. art. III, § 17. See, also, Neb.Rev.Stat. § 24-101 (Reissue 1979).
In State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893), it was held that an impeachment proceeding is to be classed as a criminal prosecution in which the State is required to establish the essential elements of the charge beyond a reasonable doubt. While an impeachment proceeding is not a criminal prosecution in the strict sense of the word, it is a judicial proceeding in the nature of a criminal proceeding in which the rules of evidence apply. Before Douglas can be found guilty and removed from office, the State must have proved beyond a reasonable doubt one or more of the specifications. The purpose of the present constitutional provision is to ensure a strictly judicial investigation of the charge according to judicial methods. State v. Hastings, supra.
An important issue in this case is what constitutes an impeachable offense. The Constitution provides that all civil officers of this State shall be liable to impeachment "for any misdemeanor in office." Neb. Const. art. IV, § 5. We think this provision of the Constitution means that the act or omission for which an officer may be impeached and removed from office must relate to the duties of the office. In State v. Hastings, supra, it was said that
where the act of official delinquency consists in the violation of some provision of the constitution or statute which is denounced as a crime or misdemeanor, or where it is a mere neglect of duty willfully done, with a corrupt intention, or where the negligence is so gross and the disregard of duty so flagrant as to warrant the inference that it was willful and corrupt, it is within the definition of a misdemeanor in office.
Id. at 116, 55 N.W. at 780.
In Hastings, the court recognized certain principles that are equally applicable today:
[T]he provision for the trial of impeachments before the supreme court was to insure a strictly judicial investigation according to judicial methods.... [W]e *875 have endeavored to adopt the rule best sanctioned by authority and which is just, alike to the state and its servants...." "[A]n impeachable high crime or misdemeanor is one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest, and this may consist of a violation of the constitution, of law, of an official oath, or of duty by an act committed or omitted, or, without violating a positive law, by the abuse of discretionary powers from improper motives or for an improper purpose."
Id. at 114-15, 55 N.W. at 780.
It is better that the state should be confined to the remedy afforded by the Criminal Code and civil action on the bonds of its officers, than an alternative so dangerous and so liable to abuse as impeachment for technical violations of law, errors of judgment, mistake of fact, or even neglect of duty ....
Id. at 128, 55 N.W. at 785.
Four of the specifications contain references to disciplinary rules of the Code of Professional Responsibility, which has been adopted by this court as the standard relating to persons admitted to the practice of law. While the provisions of the Code of Professional Responsibility are applicable to the defendant in his capacity as a lawyer, and he may be held accountable in a disciplinary proceeding for any violation of the provisions of the code, it is our opinion that a violation of a disciplinary rule as such is not an impeachable offense. Further comments regarding the code are found in our discussion of specifications Nos. 3 and 6.
The defendant, Paul L. Douglas, was admitted to the practice of law in Nebraska in 1953. His public service began in 1956, when he was appointed deputy county attorney for Lancaster County, Nebraska. Later, he was elected and served as Lancaster County attorney from 1961 to 1974. He has been the elected Attorney General of the State of Nebraska since January 1975.
The articles of impeachment relate generally to a series of transactions between the defendant Douglas and Marvin Copple, a real estate developer and director of Commonwealth Savings Company. Paul Galter, a lawyer practicing in Lincoln, Nebraska, was associated with Douglas in these transactions. Douglas and Galter were partners in a partnership known as "P.P.S.S."
The following is a brief chronology of some events and transactions involving Douglas that are relevant to this proceeding.
1. December 29, 1973. Douglas buys a car from Marvin Copple; payment is made by his $6,500 note to Copple, who the same day assigns it to Commonwealth (paid in full with interest August 30, 1979).
2. December 3, 1976. Douglas borrows $25,000 from Commonwealth for home improvements (paid in full with interest September 7, 1982).
3. January 12, 1977. Douglas and Galter contract with Marvin Copple to buy 26 unimproved lots for $241,774 (first contract).
4. April 20, 1977. Douglas borrows $241,774 from Commonwealth (guaranteed by Galter); the loan proceeds check is endorsed and delivered to Copple for the 26 lots (Commonwealth loan paid in full August 30, 1979).
5. September 8, 1977. Douglas and Galter contract with Marvin Copple to buy 40 unimproved lots for $320,755 (second contract).
6. December 27, 1977. Douglas and Galter convey the 40 lots to Judith Driscoll; consideration, $371,814.
Driscoll borrows $371,814 from Commonwealth.
Driscoll endorses the $371,814 loan proceeds check from Commonwealth and delivers it to P.P.S.S.
Douglas and Galter pay Copple $320,775 with P.P.S.S. check (payment of second contract).
7. June 1, 1979. Douglas and Galter contract with Marvin Copple to buy 12 *876 unimproved lots for $105,600 (third contract).
8. July 20, 1979. Douglas and Galter sell 12 lots to Driscoll for $120,000.
Driscoll borrows $132,600.96 from Commonwealth.
Driscoll pays $120,000 by her personal check to Douglas and Galter for 12 lots; she pays Copple $12,600.96.
P.P.S.S. pays Copple $105,600 as full payment for the 12 lots purchased.
9. August 28, 1979. Driscoll borrows $100,500 from Commonwealth to buy 8 lots remaining of the 26-lot sale of April 20, 1977, from Douglas and Galter.
10. August 30, 1979. Driscoll pays Douglas and Galter $100,500 for the 8 lots.
P.P.S.S. pays Commonwealth $119,273 by check, representing the balance due, including accrued interest, on Douglas' $241,774 loan (April 20, 1977, first contract).
Douglas pays Commonwealth $1,345.08 as balance due, including accrued interest, on car loan.
11. September 7, 1982. Douglas pays Commonwealth balance due on his home improvement loan.
The general allegations of the articles of impeachment alleged that Douglas, a lawyer, was Attorney General of Nebraska from 1974 to the present; that as a result of transactions with Marvin Copple while Douglas was Attorney General, he received fees or commissions in excess of $77,000; that on or about March 14, 1983, Douglas received a copy of a letter from an agent of the Federal Bureau of Investigation, which was then discussed with Paul Amen, the Nebraska Director of Banking and Finance; and that at this discussion Amen requested Douglas to investigate, examine, or prosecute alleged financial irregularities at Commonwealth.
It was further alleged that during the spring of 1983, Barry Lake, legal counsel to the Department of Banking and Finance, informed Douglas of possible crimes committed by Marvin Copple involving Commonwealth.
It was further alleged that on or about May 4, 1983, Ruth Anne Galter, an assistant attorney general and the estranged wife of Paul Galter, was assigned to the Department of Banking and Finance to represent the department in regard to investigations, examinations, and prosecutions concerning matters within the jurisdiction of the department; that Ms. Galter was indebted to Commonwealth at this time; and that beyond speaking with certain officers of the Federal Bureau of Investigation, the U.S. attorney, employees of the Nebraska Department of Banking and Finance, and examining an examination report, nothing of substance was done by Douglas or Ms. Galter from March 14 to October 25, 1983, concerning alleged criminal activity concerning Commonwealth or Marvin Copple.
It was further alleged that Commonwealth was declared insolvent on November 1, 1983; that on November 18, 1983, Douglas disqualified himself as to all matters relating to Commonwealth; and that prior to November 1, 1983, Douglas did not disclose to anyone in the office of the Attorney General, or in the Department of Banking and Finance, the specific nature of his financial involvement with Commonwealth, Marvin Copple, or Judith Driscoll, an employee of Copple and a participant in some of the transactions.
Although the general allegations recited that certain documents were attached to the articles and incorporated therein, no documents were attached to the copy of the resolution delivered to this court.
We emphasize again that the foregoing recitation of events taken from the articles of impeachment are simply allegations which were made by the State, some of which are not supported by the record. As a matter of fact, the evidence in this case leaves many questions unanswered. Perhaps the case is characterized more by evidence which is not in the record than by the evidence presented.
The evidence hints at a conspiracy to defraud Commonwealth by mortgaging real estate to it for amounts far in excess *877 of the value of the land. Such a charge was not made and, of course, not proved. The State was content to make peripheral charges, some of which were not impeachable offenses.
The State presented 21 witnesses in support of its case, and some 103 exhibits, 7 of which were not received, and 4 of which were not offered. On March 20, 1984, subpoenas were issued by the State for the attendance and testimony of S.E. Copple, Marvin Copple, Judith Driscoll, and Joan Copple. The subpoenas were not served at the State's request made on March 22, 1984. This court heard no evidence from any of these witnesses.
In addition, four members of the Lincoln Police Department were subpoenaed, together with a certain Lincoln Police Department investigative file, but these witnesses were not called. W.N. Stevenson and other Commonwealth loan officers who handled the Copple-Douglas-Driscoll transactions were not called.
We are not permitted to speculate as to what the testimony of these persons might have been.
Defendant was served a subpoena commanding his appearance to testify, along with the production of certain documents. Defendant filed a motion to quash the subpoena
for the reason that such subpoena violates the Attorney General's rights under the Fifth Amendment to the United States Constitution and under Article I, Section 12 of the Nebraska Constitution because in this proceeding, the Attorney General has a right to remain silent and may not be compelled to testify against himself either by words or by production of his own documents.
This motion was sustained by the court, and defendant did not testify in the trial.
Since the State offered in evidence two sworn statements of defendant, a 36-page letter written by defendant to the special counsel of the Legislature's Special Commonwealth Committee, and the statement and testimony of defendant before the legislative committee, the court was faced with a situation where, although defendant had not testified in the case, many statements made by defendant, exculpatory in nature, were before the court. In Truman v. State, 153 Neb. 247, 251, 44 N.W.2d 317, 319-20 (1950), this court stated:
And in State v. Harris, 324 Mo. 223, 22 S.W.2d 802 [ (1929) ]: "The general rule is that, while the jury may believe any statement made by a defendant which is against his interest, it is not obliged to believe statements in his own interest merely because such statements appear in a statement shown by the State to have been made by said defendant."
While the jury may or may not believe any part or all of a statement made by a defendant, it is not obligated to believe statements in his interest merely because they appear in a statement proved by the State.
When the State introduces a written statement of the defendant it is not bound by exculpatory statements contained therein but such statements are to be considered by the jury in the light of the surrounding facts and circumstances.
The differing conclusions reached by the court may well have resulted from the different weight each member of the court felt should be given to defendant's statements as a whole.
The opinion of the court as to each of the six specifications follows, together with the dissenting and concurring opinions as indicated.

SPECIFICATION NUMBER ONEDUTY NOT TO MISREPRESENT
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. Paul L. Douglas did knowingly misrepresent his knowledge of his receipt of $32,500.00 from Marvin Copple to David Domina in a sworn statement;
3. As a consequence of such knowing misrepresentation, Paul L. Douglas did violate:

*878 A. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, specifically including, but not limited to, DR 1-102(A); or,
B. Neb.Rev.Stat. § 28-901 relating to obstructing governmental operations; or,
C. Neb.Rev.Stat. § 28-924 relating to official misconduct; or,
D. Neb.Rev.Stat. § 7-105 relating to the duties of an attorney; or,
E. Neb.Rev.Stat. § 7-106 relating to deceit or collusion by an attorney.
The first specification charges that Douglas "did knowingly misrepresent his knowledge of his receipt of $32,500.00 from Marvin Copple to David Domina in a sworn statement."
Some background is appropriately discussed at this point. According to the evidence, in March 1976 Marvin Copple, a director of Commonwealth Savings Company, asked Paul Galter, an attorney, to assist him in the development of 80 acres of land Copple had purchased. Because Galter's work would not be part of the regular legal practice of his law firm, he suggested the participation of Douglas. Copple agreed, and Galter then approached Douglas. For the purpose of this development work, Douglas and Galter used the partnership known as P.P.S.S. The development resulted in the subdivision known as Fox Hollow. Douglas also did some work for Copple on his own account on an unsuccessful development called Timber Ridge, some property near Southwest 21st and A Streets, and other relatively minor matters. It is the compensation which Douglas received which is in question.
On November 30, 1983, Mr. David Domina, a special assistant attorney general, questioned Douglas under oath in the presence of a shorthand reporter, who transcribed the questions and answers. The transcription is in evidence. As related by Douglas, he and Galter would enter into an agreement with Copple to purchase lots at a set price. Copple would find a purchaser for the lots, at a higher price, give Douglas a deed, and Douglas would give the purchaser a deed. The profit was the means of compensation of Douglas and Galter. According to testimony at the trial, the net profit to Galter and Douglas, over a period of 3 years and 5 months in such transactions, was $44,700 each, after deduction of some $29,000 in interest paid by them to Commonwealth Savings Company, which financed the first transaction involving 26 lots in early 1977 to the extent of $241,774. That amount, plus interest, was fully paid to Commonwealth. Forty lots were purchased and sold later in 1977, and 12 in 1979. Douglas and Galter were not required to obligate themselves as to these 52 lots, Douglas having complained that the interest charges incurred on the $241,774 loan before resales could be accomplished made the venture too risky. Details of the 40-lot and 12-lot transactions are reserved for other specifications.
The involvement of Douglas in the Fox Hollow development does not appear to have been concealed in any way. His services, as detailed in the evidence introduced by the State, show him to have been in contact with many members of the public and public officials. One witness states that "it was very common knowledge around Lincoln during those years."
In an extended letter dated February 6, 1984, to the special counsel of the Special Commonwealth Committee of the Legislature, Douglas revealed that in addition to profits received from the lot sales above described, he was paid $32,500 by Marvin Copple in three separate checks during 1978, 1979, and 1980 "[b]ecause of the extensive additional work which I did and in which Paul Galter had little participation relating to the noise problems, alternative construction methods, the flowage easement and miscellaneous other matters." If Douglas "did knowingly misrepresent his knowledge of his receipt of $32,500.00 from Marvin Copple" in answering Mr. Domina's questions on November 30, 1983, he did so in the execution of his duties, as he was bound to assist in the investigation; and, accordingly, if the offense be deemed sufficiently serious, he could be removed upon the trial of an impeachment for a "misdemeanor in office" as that constitutional *879 term is judicially construed. We must turn, then, to the actual questions and answers, without paraphrase:
Q. Have you served as counsel, whether that means as a lawyer or not, for Marvin Copple for compensation at any time since 1975, January 1?
A. As a lawyer?
Q. All right. You qualified the question. Let's take that part of it first. Have you served as Marvin Copple's lawyer since January 1 of 1975?
A. I have not. I have never served as Marv Copple's lawyer.
Q. Have you counseled Marvin Copple in some non-legal way for pay?
A. Yes.
What immediately follows is not strictly pertinent. Later in the questioning, the following appears:
Q. Okay. What was your financial involvement, then, in Timber Ridge?
A. When you say financial involvement, I did not invest any money in it.
Q. Did you serve as counsel in connection with that development and receive compensation?
A. Yes.
Q. Were there other developments in addition to the Fox Hollow and Timber Ridge in which you served as counsel for Marv Copple or any of the Copple family?
A. First of all, I did no other business with anybody else in the Copple family except Marv.
Q. All right. Were there other developments, then, besides Fox Hollow and Timber Ridge for which you were paid for services as counsel?
A. There was always something coming up, and as it was requiring my time and my counseland I would remind him of it and periodicallyhe would pay me for it. There was a motel. He had a couple of motels.
Q. Was one of those the Town and Country Motel at 27th and "O"?
A. He owned that one.
Q. And then the Clayton House?
A. Well, Ithe Clayton House, but I had hardly anything to do with the Clayton House. He had another one on Cornhusker Highway. He wanted to build some property up at 14th and Superior. We talked about a horse breeding farm in Elkhorn. We hadwe talked about some property out on West "A", about 120th. Periodicallyperiodically Marv would have an idea, he would call and say, hey, we've got a chance to buy this and do something with it, do you have any thoughts? We would go out and look at it and talk about it. But for all practical purposesfor all practical purposes the large bulk of the time, and what I would really consider my involvement with Marv, would be Fox Hollow and Timber Ridge.
Q. Did you ever specifically bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge?
A. No.
Q. Did you ever give him orally, you know, a figure or ask for a specific amount of compensation on those other projects?
A. No.
Q. How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge or did he?
A. He never did pay me.
Q. With respect to Fox Hollow, then, what was the arrangement that you had with Mr. Copple for compensation for your services as counsel, then?
A. We were going toPaul Galter and I would make a contract with Marvin, he would sell us some lots under contract. He would then go out and find a purchaser for those lots. He then would negotiate with that purchaser for the price of the lots. Then we would sign a standard contract that somebody drew upI suppose Paul Galter didI don't know who drew the standard contract upto sell these lots under contract to the purchasers that he would find.
Q. That would be some third person who Mr. Copple would locate, he would *880 agree to buy a lot or a couple lots, whatever the case may be?
A. Yes. Hesome were to individual purchasers, some were to contractors.
Q. Then how were you to be paid as a result of that arrangement?
A. The way the contract was originally drawn up he wouldhe would sell us the lots at a hundred dollarsthe original contract that I had with himthat we had with him, that Paul Galter and I had with him listed 26 lots.
Q. All in Fox Hollow?
A. All in Fox Hollow. And there was a set total purchase price of $241,774 for the 26 lots. That was computed on the basis of a hundred dollars per frontal foot for that real estate. And that's in the contract, and I'll give you a copy of the contract. That as he would find a buyer he would give me a deed. I would give the buyer a deed. The buyer would pay me for the purchase of the lot and I would pay Marv Copple forfor that lot. In the contract each lot is not broken down individually, but he did give me a price on every one of the lots so I would know what I paid for each lot for tax purposes, and what the lot was sold for and the difference would be money that Paul Galter and I would jointly get for the sale of the lots which would compensate us for the work that we had done helping Marvin develop those lots.
Q. Was your compensation calculated on a per hour basis or a per transaction basis or how did you know how much you would be paid?
A. I didn't know how muchI had no idea how much I was going to end up making on this except, as I indicated to you, Marvin Copple had led Paul Galter and I to believeand I'm not saying deceivingly, I'm saying he led us to believe that there was a lot of money to be made and always left us with the assurance that we were going to be well compensated for it, and I remember that if he told me once he told us several times along the way as things werewere progressing very well, that our financial worries were over. He had anticipated that the whole transaction would take about two years.
Q. That is to develop Fox Hollow?
A. He thought in a two year period of time originally we would be, as he said and said, as I say, was told numerous times to both of us, that our financial worries would all be over within a two year period of time. I knew how much money he had invested in it. I knew about what each lot was costing him and I knew what kind of a tax problem he had. I knew because of what I just earlier stated to you and I knowI knew that he wanted to sell 600 lots. I knew he wanted to keep back about a hundred of them, and he was going to hold back a hundred and sell those off much later on.
Asked whether he counseled Marvin Copple in some nonlegal way for pay, Douglas answered in the affirmative. Later asked if he served as counsel in connection with Timber Ridge (a Copple development), Douglas answered in the affirmative, also pointing out that he did not invest any money in Timber Ridge. Finally, asked whether there were other developments besides Fox Hollow and Timber Ridge for which he was paid for services as counsel, Douglas answered, "There was always something coming up, and as it was requiring my time and my counseland I would remind him of it and periodicallyhe would pay me for it." If the purpose of the inquiry was to learn the nature of Douglas' association with Copple and the nature of or reason for payments to Douglas by Copple, it must be conceded that Douglas made a disclosure commensurate with the inquiry. At no time was Douglas asked the amount of compensation received, nor in another lengthy question and answer session 12 days later was the question raised. It had been made clear to the questioner that Douglas had been compensated not only by profit on the sale of lots but otherwise, by payments. "I would remind him of it and periodicallyhe would pay me for it." It only remained for the questioner to ask the amount and any other details.
*881 Complaint is made that Douglas never provided access to his tax returns. Yet, during the second (December 12, 1983) questioning of Douglas, copies of Douglas' federal income tax returns were at hand. He was asked, "Could I have copies of those returns, please?" and he answered, "I think you indicated that you wanted to see it and I have no problem in showing you this." The questioner replied, "All right. That's fine." And according to the trial testimony of Mr. John Miller:
A. Mr. Douglas never let go of the tax returns, and inthe questions were asked and the answers were given but what happened is Mr. Douglas held the tax returns, one page, and he wouldhe wouldhe came around his desk and in front of David and he would point to the tax returns, and he did notwhen David asked for the tax returns, he said well you said you wanted to see them, and he showed them.
In fairness to Paul, I'm sure he showed more than one page with respect to the specific questions that were asked, but he never released those tax returns from his possession, neither I nor David ever had physical possession of those returns. They never left the possession of Paul Douglas.
We cannot conclude from this that Douglas withheld pertinent information on his tax returns in a procedure agreed to by his questioner. Finally, according to Douglas in his statement to the legislative committee, introduced into evidence by the State, he had by that time turned over his "entire income tax returns from `75 through `82" to the committee's special counsel.
There is a discrepancy in Douglas' answers to questions in the November 30 session. Asked whether he was paid for services as counsel other than for Fox Hollow and Timber Ridge, Douglas answered affirmatively. Later in the statement, however, asked how he was paid for services on projects other than Fox Hollow and Timber Ridge, Douglas answered, "He never did pay me," meaning, according to Douglas in his statement to the legislative committee, that he was not paid for projects other than Fox Hollow and Timber Ridge. We are unable to resolve the discrepancy with the evidence at hand, but Douglas is not charged with it in the specification, nor would we be at liberty, even if requested, to permit amendment of the specification, impeachment being in the nature of an indictment by a grand jury. State v. Leese, 37 Neb. 92, 55 N.W. 798 (1893).
The defendant having disclosed receipt of payments from Marvin Copple, he cannot be said knowingly to have misrepresented their amount when he was never asked. Nor can it reasonably be maintained that the failure to volunteer the information offends Neb.Rev.Stat. § 28-901 (Reissue 1979) (obstructing government operations) even if, which is not fairly inferable from the record, the investigation was thereby deflected, for the offense must consist of physical interference or some unlawful act. Even words deliberately calculated to frustrate law enforcement have been held insufficient to support a claimed violation of a virtually identical statute. People v. Case, 42 N.Y.2d 98, 365 N.E.2d 872, 396 N.Y.S.2d 841 (1977), and cases cited. As for the alleged violations of other statutes, it is enough to say that they are clearly inapplicable.
Much of what we have heard in the evidence is disturbing, but as stated in the impeachment case of State v. Hastings, 37 Neb. 96, 123, 55 N.W. 774, 783 (1893), "It should be remembered in the first place that this is a criminal prosecution and we are not to enter upon the field of conjecture in search of a theory upon which the respondents may be pronounced guilty."
The State failed to prove specification No. 1 beyond a reasonable doubt.

SPECIFICATION NUMBER TWODUTY NOT TO LIE
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. Paul L. Douglas did knowingly misrepresent or knowingly lie to David Domina in a sworn statement, or, to the *882 Counsel on Discipline of the Nebraska State Bar Association in a letter dated on or about December 13, 1983, or, to the Special Commonwealth Committee of the Legislature in a letter response dated on or about February 6, 1984, regarding the issue of whether Paul L. Douglas had knowledge that certain lots purchased from Paul L. Douglas and Paul Galter by one Judy Driscoll were financed by Commonwealth Savings Company;
3. As a consequence of such knowing misrepresentation or knowing lie, Paul L. Douglas did violate:
A. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, specifically including, but not limited to, DR 1-102(A); or,
B. Neb.Rev.Stat. § 28-901 relating to obstructing governmental operations; or,
C. Neb.Rev.Stat. § 28-924 relating to official misconduct; or,
D. Neb.Rev.Stat. § 7-105 relating to the duties of an attorney; or,
E. Neb.Rev.Stat. § 7-106 relating to deceit or collusion by attorneys.
The letter from Douglas to the Counsel for Discipline referred to in the specification was not received in evidence.
This specification charges that Douglas did knowingly misrepresent or knowingly lie when he denied knowledge that Judith Driscoll had obtained loan funds from Commonwealth Savings Company to pay Douglas and Galter for eight lots that they sold to her. It fails for these reasons: (1) Douglas believed that he was speaking the truth at the time; (2) The alleged offense, if proven, was only a technical violation; (3) The alleged offense, if proven, was not an impeachable misdemeanor in office; and (4) The State failed to meet its burden of proof.
In effect, this specification accused Douglas of perjury: lying under oath in his sworn statement to Domina. Thus, the basis for the charge of "knowingly misrepresent or knowingly lie" appears to be grounded in Neb.Rev.Stat. § 28-915 (Reissue 1979):
Perjury ... (1) A person commits perjury if, having given his oath or affirmation in any judicial proceeding or to any affidavit on undertakings, bonds, or recognizances or in any other matter where an oath or affirmation is required by law, he deposes, affirms or declares any matter to be fact, knowing the same to be false, or denies any matter to be fact, knowing the same to be true.
Technically, the perjury statute may not have been applicable, because an oath may not have been required by law. For the purposes of our discussion here that distinction is not important.
"Precise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568 (1973). In the Bronston case the U.S. Supreme Court, in a unanimous opinion, held that an unresponsive answer if literally true does not constitute perjury, even if it is intentionally misleading and by negative implication false. See, also, United States v. Esposito, 358 F.Supp. 1032 (N.D.Ill. 1973). If the answer is literally true, the failure to volunteer more explicit information is not perjury even though the answer may create a misleading impression. In re Rosoto, 10 Cal.3d 939, 519 P.2d 1065, 112 Cal.Rptr. 641 (1974). See, also, State v. White, 31 Wash.App. 655, 644 P.2d 693 (1982); State v. Workman, 635 P.2d 49 (Utah 1981).
"To lie is to make an untrue statement with intent to deceive.... Even though a statement as to the truth of a fact is mistaken, the statement is not a lie if the sayer himself honestly believes it to be true." State ex rel. Nebraska State Bar Assn. v. Cook, 194 Neb. 364, 380, 232 N.W.2d 120, 128 (1975).
Whether an answer is false depends upon how the witness understands the question. If the answer given is true when the question is interpreted in accordance with the understanding of the witness, then the answer is not false and his statement is not a lie. It may be a question for the trier of fact whether the witness *883 so understood the question that the answer was true. Seymour v. United States, 77 F.2d 577 (8th Cir.1935).
The essence of perjury is the belief of the witness concerning the veracity of his statement, not his knowledge of the interrogator's intent. State v. Olson, 92 Wash.2d 134, 594 P.2d 1337 (1979).
In a case where the question propounded admits of several plausible meanings, the defendant's belief cannot be adequately tested and it is necessary to determine what the question meant to him when he gave the disputed answer. United States v. Lattimore, 127 F.Supp. 405 (D.C.D.C.1955), aff'd, 98 U.S.App.D.C. 77, 232 F.2d 334 (1955).
United States v. Wall, 371 F.2d 398, 400 (6th Cir.1967).
A witness who does not understand the question and gives a nonresponsive answer does not commit perjury. United States v. Paolicelli, 505 F.2d 971 (4th Cir.1974).
"The meaning of the word `know,' when used in a penal statute, varies with the context in which it is used." (Syllabus of the court.) Hancock v. State ex rel. Real Estate Comm., 213 Neb. 807, 331 N.W.2d 526 (1983).
To determine whether the statement of Douglas that he was unaware of the fact that Driscoll was financing the purchase through Commonwealth was a liea conscious, deliberate untruthit is necessary to determine what Douglas understood the question to mean. His testimony indicates that he was interpreting the word "know" to mean actual or direct knowledge, as distinguished from notice of substantial probability. His explanation that he thought the lots had been sold to third parties is consistent with a theory that Driscoll was only a conduit.
The State itself has introduced into evidence the testimony of Douglas that he was told the ultimate purchaser or purchasers had been found and that the "transaction had all been put together, that when we got there, it was just a matter of paperwork, and we got the check." Defendant stated that, at the closing, "Mr. Marvin Copple said that he would give to me a deed. I would give Judy Driscoll a deed, and Judy Driscoll would give it to the ultimate purchaser. I had no reason in the world to think that she was going to go upstairs and finance those lots." The defendant, according to evidence introduced by the State, told the Counsel for Discipline, "At no time were we advised that Mrs. Driscoll was financing them with Commonwealth Savings Company." At the legislative hearing, the point the State attempts to make is found in the question, "Despite the fact you had the check in your hand, you didn't know that she was financing it through Commonwealth Savings Company?" In the December 12 statement are the following questions and answers:
Q. Now, in any event later on Judy Driscoll then borrowed some money from Commonwealth to buy lots from you, didn't she?
A. You told me that.
Q. Did you know that?
A. I did not know that.
Q. Did Marvin Copple ever tell you that he was going to use Judy Driscoll to borrow money from Commonwealth because he couldn't?
A. No, never.
Q. You suspected that, didn't you?
A. I did not.
There is no evidence that defendant knew Judith Driscoll had signed a note in favor of Commonwealth Savings Company. The statements of Douglas were corroborated by the testimony of Paul Galter.
What must not be overlooked is that the defendant was not questioned as to Commonwealth's obvious involvement, but rather that of Judith Driscollwhether she in fact had borrowed money from Commonwealth and, more to the point, whether she was acting not on her account but as a strawwoman for Marvin Copple. Defendant denied such knowledge. What the specification amounts to is that Douglas should have drawn an inference from the $371,814 check, and the earlier transactions, that Judith Driscoll had in fact borrowed money from Commonwealth. Perhaps *884 that is so, but the failure to draw that inference and recall the transaction 4 years later is not a lie. Douglas did not knowingly lie or misrepresent.
The situation presented here, as shown by the evidence, was a business transaction to close a land sale. Douglas and Galter were required to deliver deeds of conveyance in return for payment of the agreed selling price. This occurred without complication or suggestion of irregularity. Douglas had no "in fact" notice, and he had no reason or duty to inquire concerning the "in fact" source of financing funds provided Driscoll. Subsequent to this transaction, there was no circumstances either requiring or suggesting to Douglas that he should inform himself as to the source of the loan funds.
The assumption urged by the State fails to overcome the belief of Douglas that he was telling the truth. At most, it displays the wisdom employed 100 years ago of removing impeachment proceedings from the political atmosphere of the Legislature to the judicial forum.
It is conceivable that if this allegation had been an element of conspiracy or of aiding and abetting a felony, and proven, there would be some substance to the charge. However, the only offense alleged here is that Douglas did not say what the State already knew and what it wanted him to admit. The State possessed the information sought from Douglas, and any of the answers given by Douglas on this subject neither hindered nor delayed any inquiry the State was making. Further, even if the evidence is accepted as proof of the specification, it is not an impeachable offense, because it was only a technical violation as referred to in State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893).
"[A]n impeachable high crime or misdemeanor is one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest...."
....
It is better that the state should be confined to the remedy afforded by the Criminal Code and civil action on the bonds of its officers, than an alternative so dangerous and so liable to abuse as impeachment for technical violations of law, errors of judgment, mistake of fact, or even neglect of duty....
(Emphasis supplied.) State v. Hastings, supra at 115, 128, 55 N.W. at 780, 785.
And lastly, the acts alleged in this specification do not meet the test of a misdemeanor in office that warrants impeachment, since it is not "one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest." State v. Hastings, supra at 115, 55 N.W. at 780.
The State failed to prove specification No. 2 beyond a reasonable doubt.

SPECIFICATION NUMBER THREEDUTY TO DISQUALIFY
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. On or about March 14, 1983, Paul L. Douglas in his capacity as Attorney General was notified by virtue of a letter received from the Federal Bureau of Investigation of certain transactions, which were possibly criminal in nature, occurring at Commonwealth Savings Company, and which were similar in nature to certain transactions in which he had engaged in at Commonwealth Savings Company;
3. In the spring of 1983, Paul L. Douglas was informed that Marvin Copple may be guilty of crimes involving Commonwealth Savings Company;
4. In July of 1983, Paul L. Douglas was informed that Marvin Copple may be guilty of crimes involving Commonwealth Savings Company;
5. That at all pertinent times, Paul L. Douglas was acting in his capacity as Attorney General of the State of Nebraska;
6. That notwithstanding Paul L. Douglas' previous business relationships *885 with Marvin Copple and Commonwealth Savings Company, Paul L. Douglas acting in his capacity as Attorney General of the State of Nebraska, accepted employment from the State of Nebraska regarding possible criminal activities involving Marvin Copple or Commonwealth Savings Company without obtaining the consent of his client, the State of Nebraska, after full disclosure at a time when the exercise of his professional judgment on behalf of his client, the State of Nebraska, would be or reasonably might be affected by his financial, business, property, or personal interests;
7. Notwithstanding Paul L. Douglas' previous financial and business dealings with Marvin Copple or Commonwealth Savings Company, Paul L. Douglas failed to decline proffered employment from the State of Nebraska respecting the possible criminal activities regarding Marvin Copple or Commonwealth Savings Company at a time when the exercise of his independent professional judgment, in behalf of his client, the State of Nebraska, was or might likely be, adversely affected by the acceptance of the proffered employment;
8. As a consequence of such actions, Paul L. Douglas did violate:
A. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, specifically including, but not limited to, DR 5-101(A); or,
B. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, specifically including, but not limited to, DR 5-105(A).
To attempt to prove this charge, the State does not point to any constitutional provision or statute, but rather relies solely on the claimed infractions of Canon 5, DR 5-101(A) and DR 5-105(A), of the Code of Professional Responsibility.
DR 5-101(A) provides:
Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.
The language of DR 5-105(A) is as follows:
A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of his client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interest, except to the extent permitted under DR 5-105(C) [not applicable].
As we have pointed out earlier in this opinion, the violation of the Code of Professional Responsibility may form the basis for a disciplinary proceeding, but such violation does not, per se, constitute an impeachable offense. However, the same conduct which may constitute a violation of the disciplinary regulations may amount to such a breach of the defendant's official responsibilities as to constitute negligent conduct.
We believe that the Attorney General had the duty of serving the public with undivided loyalty, uninfluenced in his official actions by any private interest or motive whatsoever. As stated by Chief Justice Vanderbilt of the Supreme Court of New Jersey, in Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 474-76, 86 A.2d 201, 221-22 (1952):
They [public officers] stand in a fiduciary relationship to the people whom they have been elected or appointed to serve.... As fiduciaries and trustees of the public weal they are under an inescapable obligation to serve the public with the highest fidelity. In discharging the duties of their office they are required to display such intelligence and skill as they are capable of, to be diligent and conscientious, to exercise their discretion not arbitrarily but reasonably, and above all to display good faith, honesty and integrity.... They must be impervious to corrupting influences and they must transact their business frankly and openly in the light of public scrutiny so that the public may know and be able to judge them and their work fairly....

*886 These obligations are not mere theoretical concepts or idealistic abstractions of no practical force and effect; they are obligations imposed by the common law on public officers and assumed by them as a matter of law upon their entering public office.
In Copple v. City of Lincoln, 202 Neb. 152, 167, 274 N.W.2d 520, 528 (1979), this court cited the following language from another New Jersey case: "`The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends on the circumstances of the particular case.'"
The substance of the third specification is that notwithstanding that the defendant had been advised in March of 1983 that certain transactions of a possible criminal nature had occurred in the operations of Commonwealth, "similar in nature to [those] in which he [the defendant] had engaged," and notwithstanding that in July of 1983 the defendant had been advised of possible criminal actions of Marvin Copple, with whom the defendant had become involved in some rather bizarre business dealings, he nevertheless "accepted employment from the State of Nebraska" regarding those various activities without disclosing the nature of his previous relationship with Copple and Commonwealth, and he "failed to decline proffered employment from the State of Nebraska." We feel compelled to state at this point that we were furnished with no details as to the time of occurrence or nature of the "transactions, which were possibly criminal in nature," which prevents us from fully exploring the scope of the defendant's alleged conflict of interest.
However, one of the problems with the charge as specified is that it really does not fit this situation. The defendant in this case was employed by the State of Nebraska before, during, and after his extracurricular dealings. There were no statutory provisions precluding outside employment on the part of the Attorney General in effect at the time. By case law, a public officer is not necessarily required to give every instant of his time to the public service in such a sense that he cannot, if wholly consistent with public duties, perform any other service or earn money from any other source. State v. Hinshaw, 197 Iowa 1265, 198 N.W. 634 (1924). Nevertheless, we believe that Douglas had a duty to avoid entanglements which potentially could cause a division of his loyalties. Because he did not choose to do so, we must examine his personal situation as of the spring of 1983.
The defendant had engaged in a series of intricate real estate dealings with Marvin Copple, commencing in about 1977. These are set forth in considerable detail in other portions of this opinion. The conclusion of those transactions occurred on July 20, 1979, when Marvin Copple was paid for the last of the lots purchased by Douglas and Galter.
In addition, the defendant did certain other work for Marvin Copple, during the years 1978, 1979, and 1980, for which he was paid the sum of $32,500. Altogether, Douglas devoted approximately 1,500 hours to his dealings with Copple.
During this same period of time, the defendant had made several loans with Commonwealth. With the payoff of the final loan in the amount of $54,048.51 on September 7, 1982, his business relations with that institution apparently ceased. However, the source of funds used to repay that loan was a $55,000 loan from First Security Bank & Trust Co. of Beatrice, Nebraska, an institution with a management familial relationship with Commonwealth. That loan was paid in full on November 25, 1983.
As nearly as can be determined from the record, no business relationship existed between Douglas on the one hand and Copple and Commonwealth on the other hand as of March 14, 1983. Therefore, it cannot be said that Douglas was at that point actively representing interests which conflicted with those of the State.
The State would seem to argue, however, that the defendant's enthusiasm for investigation of, and judgment as to possible prosecution *887 for, insider loans to Marvin Copple might very well be dimmed by the fact that the defendant's own personal interests and conduct may have been a link in the chain of alleged illegal activities. Certainly, such thoughts have occurred to a number of people.
However, there is no evidence that Douglas acted in the discharge of the responsibilities of his office any differently than he would have, had the unfortunate prior dealings never occurred. According to the practices and procedures of that office, the Department of Banking and Finance would have remained primarily obligated to investigate the condition of Commonwealth and other financial institutions. An assistant attorney general would have been assigned full time for the general investigative and legal work required by the Department of Banking and Finance. That assistant attorney general would have been directed by the Department of Banking and Finance and would have been directly responsible to Deputy Attorney General Gerald Vitamvas. That is exactly how this case was handled; and the work performed by the assistant attorney general assigned to the Department of Banking and Finance to investigate many financial institutions, including Commonwealth, was done in a professional manner and was thoroughly acceptable to the department.
The Attorney General did have the appearance of possessing a conflict of interest, and normally should have made a full public disclosure. However, when one considers that the Department of Banking and Finance was interested in avoiding prosecution, if possible, and even in avoiding adverse publicity so as not to cause the "house of cards" to come tumbling down, the defendant's reticence to "rock the boat" is understandable. These facts are set forth in great detail in our discussion of specification No. 5.
In order to warrant a finding of guilty, we must conclude beyond a reasonable doubt that the defendant's conduct rose to the level of willful neglect with a corrupt intention or that it amounted to gross negligence accompanied by such a flagrant disregard of his duty as to warrant an inference that it was done willfully and corruptly. On the basis of the record before us, we cannot do so.

SPECIFICATION NUMBER FOUR DUTY TO AVOID INSIDER BORROWING
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. During 1979, Marvin Copple was an officer or Director of Commonwealth Savings Company;
3. On or about August 28, 1979, Marvin Copple borrowed from Commonwealth Savings Company, directly or indirectly, without first having secured the approval of the Board of Directors of such industrial loan and investment company, the sum of $100,500.00, and Paul L. Douglas aided, abetted or assisted in such borrowing;
4. As a consequence of the foregoing, Paul L. Douglas violated the provisions of Neb.Rev.Stat. § 8-409.06.
Although there may be some doubt whether this specification as phrased would support a criminal charge, it is sufficient in this impeachment proceeding considering the full impeachment resolution. Douglas is informed that he was charged with aiding and abetting Marvin Copple to borrow funds from Commonwealth Savings Company in violation of Nebraska statutes, Neb.Rev.Stat. §§ 8-409.01 and 8-409.06 (Reissue 1983), and that such conduct was a misdemeanor in office, Neb. Const. art. IV, § 5.
The following is a summary of the evidence relevant to this specification. In 1977 Paul Douglas and Paul Galter, as partners, purchased 26 residential lots from Marvin Copple for $241,774; the deeds of conveyance were executed in favor of Douglas as grantee; Douglas borrowed all of the purchase price, $241,774, from Commonwealth Savings Company, and immediately paid this sum to Marvin Copple. This paid Copple in full for the 26 *888 lots. The Douglas loan was paid in full with accrued interest on August 30, 1979.
On or about August 28, 1979, Douglas sold eight of these lots to Judith Driscoll for $100,500, which sum she borrowed from Commonwealth, represented by its check dated August 30, 1979. On August 30, 1979, Driscoll paid Douglas $100,500 by her check, which he deposited in the P.P. S.S. partnership account; those funds, with some additional partnership money, were paid that date to Commonwealth to pay the balance of the $241,774 loan with all accrued interest. The evidence before us, including records of Commonwealth, is silent as to any fact that Marvin Copple either (1) originated, approved, or benefited from this Driscoll loan, or (2) directly or indirectly obtained any proceeds from this loan, or (3) directly or indirectly borrowed all or any part of this Driscoll loan. Marvin Copple had been paid in full for any interest he had in these eight lots on April 20, 1977.
The State argues that this loan transaction must be viewed in the light of all of the previous real estate transactions wherein Douglas was involved with either Marvin Copple, Driscoll, or Commonwealth, claiming that from these it is clear that both Douglas and Copple benefited from this Driscoll loan and that the "borrowing" statutes were violated.
The "insider borrowing" statutes involved here became law on August 24, 1979. They provide:
8-409.01. Industrial loan and investment company; loan to director, officer, or employee; requirements. No director, officer, or employee of an industrial loan and investment company, no corporation in which an officer of the industrial loan and investment company is the owner of a controlling interest, and no partnership in which an officer of the industrial loan and investment company is a member, shall borrow any of the funds of the industrial loan and investment company, directly or indirectly, without first having secured the approval of the board of directors of such industrial loan and investment company. The approval shall be made at a meeting of the board and a record of such approval shall be made and kept as part of the records of such company. The amount of any loan shall be limited as provided in sections 8-409 and 8-409.02.
8-409.06. Violations; penalty. Any officer, director, or employee of an industrial loan and investment company, or any other person who shall violate sections 8-409.01 to 8-409.05, or who shall aid, abet, or assist in such violation shall be guilty of a Class IV felony.
The terms "borrow" and "indirectly" are not defined in the statutes; however, they have been considered in our prior decisions involving similar banking situations:
(1) Lending by the bank involved to the borrowing official, either directly or indirectly. (2) On the part of the delinquent officer, it implies making himself indebted for; to appropriate; to take, receive or derive, funds of the bank lending to him, either directly or indirectly. (3) It involves the diminishment of the "funds of the loaning bank" to the extent of the loan made. It must, in other words, amount to a debtor and creditor transaction in which the delinquent officer is the ultimate debtor, and the bank involved the ultimate and real creditor.
Hinds v. State, 121 Neb. 508, 512, 237 N.W. 617, 619 (1931).
"Indirectly" signifies the doing by an obscure circuitous method something which is prohibited from being done directly, and includes all methods of doing the thing prohibited except the direct one.
State v. Pielsticker, 118 Neb. 419, 423, 225 N.W. 51, 52 (1929).
Since the statutes do not define a "person who shall ... aid, abet, or assist," we look to the applicable statutes, enacted in 1977.
28-205. Aiding consummation of felony; penalty. (1) A person is guilty of aiding consummation of felony if he intentionally aids another to secrete, disguise, or convert the proceeds of a felony or otherwise profit from a felony.

*889 (2) If the crime involved is a felony of any class, aiding consummation of crime is a Class IV felony.
28-206. Prosecuting for aiding and abetting. A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender.
"Aiding and abetting involves some participation in the criminal act or involves some conscious sharing in the criminal act, as in something that accused wishes to bring about, in furtherance of the common design, either before or at the time that the criminal act is committed, and it is necessary that he seeks by his action to make it succeed...."
State v. Alvarez, 189 Neb. 276, 280, 202 N.W.2d 600, 603 (1972).
"Where a crime requires the existence of a particular intent, an alleged aider or abettor cannot be held as a principal unless it is established that the aider knew that the perpetrator of the act had the required intent, or that the aider himself possessed the required felonious intent."
State v. Dittrich, 191 Neb. 475, 480, 215 N.W.2d 637, 640 (1974).
Where in an impeachment proceeding the act of official delinquency consists in the violation of some positive provision of the constitution or statute which is denounced as a crime or misdemeanor... it is a misdemeanor in office within the meaning of section 5, article 5, of the constitution.
(Syllabus of the court.) State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893).
The State had the burden to prove beyond a reasonable doubt each of these elements: That on or about August 28, 1979, (1) Marvin Copple was a director, officer, or employee of Commonwealth Savings Company; (2) Marvin Copple did directly or indirectly borrow funds from Commonwealth Savings Company; (3) such borrowing was done without his first having secured the approval of the board of directors of Commonwealth Savings Company at a meeting of that board wherein a record of the approval was made and kept; (4) Paul Douglas did intentionally aid and abet Marvin Copple to violate § 8-409.01 in that he did secrete, disguise, or convert the proceeds of a felony or otherwise profit from a felony; and (5) such acts or omissions of Paul Douglas constituted a misdemeanor in office warranting his impeachment.
We review the record as to these elements. The evidence lacks depth on the issue of Copple's official business association with Commonwealth; however, the reports filed by Commonwealth with the Nebraska Department of Banking and Finance show that in 1978 and 1979 Marvin Copple was a member of the board of directors of Commonwealth. The State met its burden in this impeachment proceeding as to element (1).
On the element of "borrowing" there is no direct evidence in the record before us that Marvin Copple was the ultimate debtor and that he either directly or indirectly had any legal obligation as a debtor to pay the $100,500 Driscoll loan to Commonwealth. The circumstantial evidence previously suggested by the State includes the personal and business relationships between Copple and Douglas, Douglas' loans with Commonwealth, and the sale of the lots to Judith Driscoll, Copple's private secretary, who borrowed all of the purchase price of the lots from Commonwealth. Such circumstantial evidence is entirely speculative; it falls far short of the required proof. See State v. Buchanan, 210 Neb. 20, 312 N.W.2d 684 (1981). The State failed to prove element (2) beyond a reasonable doubt, and therefore we need not discuss the remaining elements. Specification No. 4 must fail.

SPECIFICATION NUMBER FIVEDUTY TO INVESTIGATE
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. On or about March 14, 1983, Paul L. Douglas received a copy of a letter from the Federal Bureau of Investigation generally describing financial irregularities *890 occurring at Commonwealth Savings Company;
3. Sometime in March, 1983, Paul L. Douglas met with Barry Lake and Paul Amen, and possibly others, to discuss the F.B.I. letter and financial irregularities;
4. In the spring of 1983, on a date unknown, Barry Lake advised Paul L. Douglas of possible criminal activity involving Marvin Copple and Commonwealth Savings Company;
5. On or about May 4, 1983, Paul L. Douglas assigned, or consented to the assignment of, Ruth Anne Galter, an Assistant Attorney General, to the Nebraska Department of Banking and Finance for the purpose of assisting said Department in prosecuting "white collar" crime;
6. At all material times, Paul L. Douglas was aware of the fact that Ruth Anne Galter was personally indebted to Commonwealth Savings Company for large sums of money and that she was the estranged wife of Paul Galter;
7. In July of 1983, on a date not known, Ruth Anne Galter advised Paul L. Douglas of the possibility of criminal activity involving Marvin Copple and Commonwealth Savings Company;
8. The Nebraska Department of Banking and Finance made available or would have made available to Paul L. Douglas or Ruth Anne Galter all information it had in its possession regarding alleged criminal activity involving Marvin Copple or Commonwealth Savings Company from and after March 14, 1983;
9. Substantially nothing was done to prosecute or investigate Marvin Copple or Commonwealth Savings Company, from March 14, 1983, until Commonwealth Savings Company was declared insolvent on November 1, 1983, by Paul L. Douglas or any of his subordinates;
10. By virtue of the foregoing, Paul L. Douglas violated the provisions of Neb.Rev.Stat. § 84-205(4) and other laws of the State of Nebraska generally.
Paragraphs 2 to 8 of the specification are general statements of information, knowledge, and evidence that Douglas is alleged to either have possessed or had available to him as Attorney General; they all concern financial irregularities at Commonwealth and the possible criminal activity of Marvin Copple. The charge in paragraph 9, "Substantially nothing was done to prosecute or investigate ...," falls far short of being specific. From this charge we conclude that the State admits that Douglas did in some way respond to the information he either possessed or had available to him; however, it then alleges his judgment and response did not meet the standard imposed by the Constitution, statutes, and his inherent common-law duties, and implies that his acts or omissions were "`subversive of some fundamental or essential principle of government or highly prejudicial to the public interest ....'" State v. Hastings, 37 Neb. 96, 115, 55 N.W. 774, 780 (1893).
The principal facts upon which the specification is based relate to the March 10, 1983, FBI letter, a carbon copy of which was received by the defendant, and a conversation between the defendant and Barry Lake which took place sometime during the spring of 1983.
The gravamen of the charge is that substantially nothing was done to prosecute or investigate Marvin Copple or Commonwealth Savings Company from March 14, 1983, until after November 1, 1983, the date on which Commonwealth was declared insolvent by the Department of Banking and Finance. The evidence shows that some investigation was made but no prosecution was commenced during this period. Thus, the charge is that the defendant failed to do sufficient investigation during this time, and failed to prosecute Copple.
The last paragraph of the specification refers to Neb.Rev.Stat. § 84-205(4) (Reissue 1981), and alleges that the defendant violated this statute and "other laws of the State of Nebraska generally." The statute cited provides that the duties of the Attorney General shall be:
(4) At the request of the Governor, the head of any executive department, the Secretary of State, State Treasurer, Auditor of Public Accounts, Board of Educational *891 Lands and Funds, State Department of Education or Public Service Commission, to prosecute any official bond or any contract in which the state is interested, deposited with any of them, and to prosecute or defend for the state all actions and proceedings, civil or criminal, relating to any matter connected with any of their departments; Provided, that, after investigation, he is convinced there is sufficient legal merit to justify the proceeding; and none of the above-named officers shall pay, or contract to pay, from the funds of the state any money for special attorneys or counselors at law, unless the employment of such special counsel shall be made upon the written authorization of the Governor or the Attorney General.
This statute requires the Attorney General, when requested by the Governor, the head of any executive department, or certain other named officers, (1) to prosecute any official bond or any contract in which the State is interested; and (2) to prosecute or defend for the State all actions and proceedings for the named departments.
Under this statute there is no duty to investigate until the Attorney General has been requested to prosecute or defend. The investigation which is to be made is for the purpose of determining if there is sufficient legal merit to justify the proceeding.
We recognize that the Attorney General has some duties which are not purely statutory and are sometimes referred to as the common-law duties of the office. In State v. State Board of Equalization and Assessment, 123 Neb. 259, 242 N.W. 609 (1932), we stated that the Attorney General is clothed and charged with all such common-law powers and duties except insofar as they have been limited by statute; and in the absence of some express legislative restriction to the contrary, he may exercise all such power and authority as the public interests may require from time to time. See 7 Am.Jur.2d Attorney General § 9 (1980).
"It is generally acknowledged that the attorney general is the proper party to determine the necessity and advisability of undertaking or prosecuting actions on the part of the state." 7 Am.Jur.2d, supra § 16 at 20; State v. Pacific Express Co., 80 Neb. 823, 115 N.W. 619 (1908). This discretion is obvious when exercising inherent powers; and it is also recited in § 84-205(4), "Provided, that, after investigation, he is convinced there is sufficient legal merit to justify the proceeding ...." (Emphasis supplied.)
"`[I]nvestigation' means the process of inquiring into or tracking down through inquiry ... `investigate' means to follow up by patient inquiry or observation; to inquire and examine with systematic attention to detail and relation." Mason v. Peaslee, 173 Cal.App.2d 587, 592 n. 2, 343 P.2d 805, 808 n. 2 (1959).
Although § 84-205 provides that the Attorney General shall have the same powers and prerogatives in each of the several counties of the state as the county attorneys have in their respective counties, the affirmative duty to prosecute all criminal matters is specifically placed upon the county attorney. Neb.Rev.Stat. § 23-1201 (Cum.Supp.1982). This is a common arrangement throughout the United States. See 7 Am.Jur.2d, supra § 13.
The evidence shows that with regard to criminal prosecutions the usual and customary practice, and the procedure which had been followed by the office of the Attorney General, was to refer them to the proper county attorney after an investigation by the interested department had developed sufficient information to establish that a criminal prosecution was justified. This policy had been one of necessity because the office of the Attorney General did not have sufficient personnel or resources to carry on investigations, except in a few limited areas, and the other departments had skilled employees who were trained and experienced in their particular fields of operation. This was especially true with respect to financial institutions which were supervised and examined routinely by personnel of the Department of Banking and Finance.
*892 The evidence further shows that this procedure was followed in 1982 in connection with a prosecution in Douglas County, Nebraska, for the violation of banking laws and regulations. The Department of Banking and Finance, through Barry Lake, delivered a complete report of investigation, together with a suggested form of complaint, to the office of the Attorney General. The matter was referred to the county attorney of Douglas County, Nebraska, and prosecutions instituted and completed in 1983.
The FBI letter of March 10, 1983, was addressed to the Director of Banking and Finance, and stated that during an investigation at Beatrice, Nebraska, information was obtained concerning similar transactions at Commonwealth, including a $1,250,000 transaction in which S.E. Copple received $750,000 of the proceeds. The letter advised the director that the FBI could provide further details concerning the matter. The letter, which did not mention Marvin Copple, was not a surprise to the banking department because it had been advised in 1982 about the investigation being made in Beatrice.
On March 14, 1983, after the copy of the FBI letter had been received by the Attorney General, there was a conference at the office of the Attorney General with Paul Amen, the Director of Banking and Finance, and Barry Lake, an assistant director of the banking department and counsel to the department, concerning the letter. The evidence is in conflict as to other personnel present at this meeting.
The substance of the conversation was that the Director of Banking and Finance was very concerned about the financial condition of Commonwealth and a number of other industrial loan and investment companies. The director testified that he related his "deep concern about the industrials"; that any type of prosecution "would blow the lid"; and that it would mean "a number of these industrials would come tumbling down." He further testified that he felt the failure of one institution, or perhaps even some adverse publicity, could cause a run and eventually topple the entire industry.
Lake admitted that at this conference they did not disclose to the defendant in any extensive detail the information in the reports of examination or information the department had on insider transactions. As early as March 31, 1982, the department knew of "numerous insider transactions" at Commonwealth, including a loan to Dana Saylor in which the proceeds were endorsed to Newt Copple.
Although the director did not specifically ask the Attorney General not to investigate Commonwealth, there was no request to investigate and no request to prosecute anyone connected with Commonwealth at that time. The director testified that "our position was simply to point out the seriousness of our problem and what we thought would happen if there were an investigation and possible prosecution." It was concluded at the meeting that someone should talk to the FBI about the letter. Barry Lake testified that "it was resolved that I would go to the Federal Bureau of Investigation and discuss that letter with them."
It was the aim and purpose of the Department of Banking and Finance to save the institution for the depositors, if possible, by obtaining an infusion of capital and finding a purchaser. In accordance with banking department policy, criminal prosecution was the last step in the process, and was not to be commenced until the institution had been saved or all efforts to save the institution had been attempted.
The effort to save Commonwealth was successful only in part, in that S.E. Copple contributed additional property and capital to the institution. The department was unable to find a buyer, and on November 1, 1983, Commonwealth was declared insolvent and was closed by the Department of Banking and Finance. After the institution was closed there was some delay in commencing the receivership proceeding because the director was still trying to find a purchaser and did not want the Attorney General to file a petition in the district court immediately.
*893 During 1983 and earlier, the Department of Banking and Finance had been trying to obtain the services of a full-time assistant attorney general to assist the department with the large number of matters that were then pending in the department. Most of these matters involved security law violations, but there were also banking law violations. Lake estimated that the department had about a 2-year backlog of securities cases and an increasing number of criminal cases involving banks and other depository institutions like industrial loan and investment companies. On October 1, 1982, an assistant attorney general was hired and assigned to the banking department full time, but this employee left for a better paying job on October 11, 1982. There was a delay in finding another employee, partly due to transitional problems resulting from a change in the office of the Governor. During the interim, an assistant attorney general was assigned to the department, but not on a full-time basis.
On July 1, 1983, upon the recommendation of Gerald Vitamvas, the deputy attorney general, Ruth Anne Galter, an assistant attorney general of some 5 years' experience, was assigned to the Department of Banking and Finance full time. The assignment was actually made on May 4, 1983, but her duties with the banking department did not commence until June 1, and she was not full time until July 1, 1983.
On May 10, 1983, Ms. Galter met with Barry Lake and Patricia Herstein, also an assistant director and legal counsel to the department. Ms. Herstein had prepared two memorandums, one of which was a detailed list of matters which were under investigation and of concern to the department. The list contained 25 to 35 items, but Commonwealth was not on the list.
On or about May 4, 1983, Barry Lake mentioned to the defendant that a report of examination of Commonwealth disclosed that Marvin Copple had received two $250,000 fees or commissions as part of a real estate transaction, which Lake thought amounted to theft. He did not testify to, and the record does not show, the date the fees or commissions were received. At this conversation the defendant stated that he had had "a personal and prior business relationship with Marvin Copple but he said that would not make any difference with respect to any criminal prosecution" and that "if Marv Copple was guilty of any crimes, that he would prosecute Marv Copple."
According to Lake, he advised Ms. Galter at a meeting with her on June 24, 1983, that she was to "review and supervise" any potential criminal activity in regard to Commonwealth and its principals. A typewritten status report of department investigations prepared by Lake and dated June 23, 1983, listed seven matters under investigation. Two items were added to this list in handwriting, one of which was "Commonwealth Sav Co.Copples." The list included cases involving two industrial loan and investment companies other than Commonwealth, a cooperative credit association, and four banks. Lake testified that each of the nine items was discussed with Ms. Galter on June 24, 1983.
Lake testified that he met with Ms. Galter "every other two weeks" to discuss matters that she was working on and that he was satisfied with the progress which she made. Lake further testified that in his discussions with Ms. Galter he told her that, because of the large volume of cases that had been referred to her, "we should try to be as efficient as we could and that we should try to piggyback off of the FBI's investigation as much as possible." He further testified, "I mentioned to her my meeting with the FBI, the general substance of it and said I thought it would be a good idea for her to meet with the FBI and possibly the U.S. Attorney's office to try to get as much of theof evidence from their investigation as she could so that she wouldn't have to duplicate interviewing the people they had already interviewed."
On June 30, 1983, Ms. Galter met with Ronald Lahners, the U.S. attorney, concerning the Commonwealth matter. She was referred to Agent Campbell of the FBI, and she had several telephone conversations with Campbell. Campbell mentioned the names of several people, but *894 stated that the information she wanted could be found in the records of the Department of Banking and Finance. She requested information concerning Commonwealth from both Lahners and Campbell, but it was not made available to her.
According to Ms. Galter, when she looked over a report of examination of Commonwealth in July, she requested a copy of the report, but it was not furnished to her. She requested a copy of the report again in October, but it was not given to her.
Both Lake and Ms. Galter testified that from time to time Lake would advise her as to which cases had priority and should be worked on first. Lake testified that the department did not set any specific priority on the Commonwealth matter. There is no evidence that Commonwealth was ever given a high priority by the banking department or that Ms. Galter was instructed to give it preference over the many other cases which had been assigned to her.
It is important to recognize the number of cases which had been assigned to Ms. Galter between July 1 and November 1, 1983, by the Department of Banking and Finance through Lake. During this time, Ms. Galter assisted the county attorney of Buffalo County in two cases. One, State v. Giese, involved a complicated fraud and theft charge. The other, State v. Doolittle, involved investigation in numerous counties. She was involved in State v. Soukup and State v. Adams, both of which were filed in Sarpy County but involved transactions in both Douglas and Sarpy Counties. There were two criminal matters in Knox County which required her time. When the Bank of Niobrara failed, that matter required a week of her time. The financial crisis involving the Bank of Blair took a week of her time.
When Ruth Anne Galter reported to the defendant that she was investigating the matter of the $500,000 in commissions received by Marvin Copple, she was directed by the defendant to "keep on it" and "keep him advised." There is no evidence that Ruth Anne Galter failed to pursue the investigation or did anything which hampered or prejudiced the investigation of the commissions received by Marvin Copple from Commonwealth.
It is true that Ruth Anne Galter was indebted to Commonwealth at the time she was assigned to the Department of Banking and Finance and that she was the estranged wife of Paul Galter, who was a participant in the real estate transactions with the defendant. She was concerned about the possibility of a conflict of interest, and discussed the matter with the defendant and obtained legal advice from private counsel. She was advised by her counsel that there was no conflict of interest at that time. When Commonwealth was declared insolvent, Ruth Anne Galter requested that she be relieved of any further duties in regard to Commonwealth because of the conflict of interest arising out of her indebtedness to Commonwealth, which was then about to be placed in receivership.
From our consideration of the evidence we find that the allegations contained in specification No. 5 were not proved beyond a reasonable doubt and that the specification forms no basis upon which to remove the defendant from office. There is no evidence of gross neglect of any duty of the office, and no evidence of corrupt conduct or other malfeasance.
We believe it is appropriate to point out that whatever delay there may have occurred in regard to a prosecution of Marvin Copple was consistent with the policy of the Department of Banking and Finance and its efforts to save the institution. There is no evidence of any prejudice to the State whatever in regard to a prosecution of Marvin Copple because of a failure to commence a prosecution at any time prior to November 1, 1983. Insofar as an investigation of Commonwealth is concerned, from the evidence presented in this case it would appear that most of the essential information was already in the possession of the banking department at the time of the conference with the Director of Banking and Finance at the office of the Attorney General on March 14, 1983. There is *895 no evidence whatever of any prejudice to the State from a failure to conduct a more extensive investigation during the 7½-month period prior to November 1, 1983, alleged in the specification.
Under the evidence in this case the Attorney General had no duty to refuse to cooperate with the Director of Banking and Finance in his efforts to save the institution. While these efforts may have been futile because of the condition of the institution, there is no evidence that the Attorney General was aware of the true financial condition of Commonwealth, and no evidence that he should have questioned the judgment of the Director of Banking and Finance in the matter.

SPECIFICATION NUMBER SIXDUTY TO AVOID EVEN THE APPEARANCE OF IMPROPRIETY
1. The general allegations hereinabove recited are incorporated herein as if set forth verbatim;
2. From approximately 1973 until approximately 1982, Paul L. Douglas engaged in various business transactions with Marvin Copple, Judy Driscoll, or Commonwealth Savings Company which were not in the ordinary course of business, all as more specifically described in the report of Officer Lowe of the Lincoln Police Department, dated February 21, 1984, and the report of David Domina and John Miller, dated January 20, 1984;
3. Paul L. Douglas did not fully and openly and honestly cooperate with Special Assistant Attorney General David Domina in Mr. Domina's investigation into possible acts of official wrongdoing;
4. As a result of the foregoing, Paul L. Douglas violated:
A. The Code of Professional Responsibility adopted by the Nebraska Supreme Court including, but not limited to, DR 1-102, or,
B. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, including, but not limited to, the ethical considerations related [to] DR 8; or,
C. The Code of Professional Responsibility adopted by the Nebraska Supreme Court, including, but not limited to, the ethical considerations related to DR 9; or,
D. Neb.Rev.Stat. § 7-105 relating to the duties of attorneys; or,
E. Neb.Rev.Stat. § 7-106 relating to deceit or collusion by attorneys; or,
F. Neb.Rev.Stat. § 28-901 relating to obstructing governmental operations; or,
G. Neb.Rev.Stat. § 28-924 relating to official misconduct.
Paragraph 2 of the specification refers to reports which were not received in evidence. The allegation that various transactions "were not in the ordinary course of business" did not allege an impeachable offense, because it does not describe an official delinquency.
The allegation in paragraph 3 that Douglas did not fully, openly, and honestly cooperate was discussed in part in connection with specifications Nos. 1 and 2. To the extent that the allegations are intended to expand upon those in specifications Nos. 1 and 2, they do not contain any specific statements of fact sufficient to constitute an impeachable offense. The Miller-Domina report was not received in evidence and the police report was not offered.
The State's theory is that (1) Douglas was engaged in financial transactions outside of the ordinary course of business, (2) Douglas was neither candid, open, nor honest when interviewed by John Miller and David Domina, and (3) such acts and omissions violated his duty to avoid the appearance of impropriety.
Specification No. 6 alleges that Douglas violated Canon 9 of the Nebraska Code of Professional Responsibility. This code in its present form was proposed in 1969 by the American Bar Association (ABA); it was later adopted, with few exceptions not applicable here, by the Supreme Court of the State of Nebraska.
The general purpose of the code is to encourage and develop the conscience *896 and ethics of lawyers in their professional and private lives, to the end that the institution of the law merits and receives the trust and respect of the public. These excerpts are taken from the Preliminary Statement of the ABA draft of the code to further explain the code.
The Code is designed to be adopted by appropriate agencies both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below the required minimum standards stated in the Disciplinary Rules.
....
The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession....
....
.... The Code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule, nor does it undertake to define standards for civil liability of lawyers for professional conduct.
(Emphasis supplied.) ABA Code of Professional Responsibility 2 (Final Draft 1969).
The following from Canon 9 of the code, referred to in the specification, lends further explanation of the lawyer's duty to avoid the appearance of professional impropriety.
EC 9-1. Continuation of the American concept that we are to be governed by rules of law requires that the people have faith that justice can be obtained through our legal system. A lawyer should promote public confidence in our system and in the legal profession.
....
EC 9-6. Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and the judges thereof; to observe the Code of Professional Responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with his brother lawyers in supporting the organized bar through the devoting of his time, efforts, and financial support as his professional standing and ability reasonably permit; to conduct himself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of his clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety.
The present Nebraska State Bar Association (NSBA) was formed as an integrated bar in 1937. In re Integration of Nebraska State Bar Ass'n, 133 Neb. 283, 275 N.W. 265 (1937). The Supreme Court of the State of Nebraska governs the admission of lawyers to practice law and their professional conduct; it is vested with the singular power and authority to discipline lawyers, including power to disbar, suspend, and/or censure, as the nature and circumstances of the case warrant. Complaints concerning alleged violations of the code are processed through disciplinary committees and the Counsel for Discipline of the NSBA.
We do not intend to say that violations of a code disciplinary rule do not have substance. On the contrary, the code is viable, but it concerns only standards of conduct, discipline, and penalties relating to a lawyer's professional life. Whether the defendant has violated the Code of Professional Responsibility is a matter to be determined in a disciplinary proceeding commenced for that purpose.
Although an act or omission by a lawyer may be both a violation of a disciplinary rule and an impeachable offense, it does not follow that a violation of a disciplinary rule, as such, is an impeachable offense.
It is further noted that in addition to possible disciplinary measures under the Code of Professional Responsibility, and dependent upon the nature and the circumstances of an alleged violation, a lawyer may be held liable in the civil courts and prosecuted in the criminal courts.
Insofar as specification No. 6 alleged a duty to avoid even the appearance of impropriety, *897 it did not allege an impeachable offense.
For the reasons stated the defendant is adjudged not guilty of all specifications.
JUDGMENT OF NOT GUILTY.
HASTINGS, SHANAHAN, and GRANT, Justices, and MORAN, District Judge, dissenting.
For the reasons hereinafter stated we dissent from the acquittal on specification No. 1duty not to misrepresent.
Paul L. Douglas, before being elected Attorney General of the State of Nebraska, invested in the commodities market with a friend, Paul E. Galter, a Lincoln attorney. That venture into commodities was unsuccessful, for Douglas and Galter lost $40,000a $20,000 loss sustained by each in the market endeavors.
After Douglas' election as Attorney General, Galter told Douglas about a real estate investment, namely, real estate development projects by Marvin Copple, a friend and client of Galter's. Regarding the prospective developments and the roles of each participant, initial capital or financing was supplied by Copple; Galter provided any "purely legal services"; and "many other services" would be provided by the threeCopple, Galter, and Douglas. Douglas, who had no experience in land development, acted as a consultant to Copple in the projects.
The real estate projects involving Douglas centered around developments known as Fox Hollow and Timber Ridge. From January 1, 1977, to June 1, 1979, Galter and Douglas bought 78 Fox Hollow lots from Copple at an aggregate price of $668,129. Throughout this time, Copple was a director of Commonwealth Savings Company, a fact known to Douglas. Copple sold Galter and Douglas lots at a "discount" or reduced purchase price. When Galter and Douglas resold the lots, profit on the resale would constitute their compensation for services rendered to Copple for the real estate projects. It was contemplated that the entire "transaction would take about two years." Copple told Galter and Douglas that their "financial worries were over."
Among his consulting services to Copple, Douglas visited members of Lincoln's city council about zoning Timber Ridge, conferred with the Lincoln city attorney and with the U.S. Corps of Engineers about a water easement in Fox Hollow, met with paving contractors concerning Fox Hollow, and studied methods of installing utilities in Fox Hollow. The bulk of Douglas' time in consulting was directed to Fox Hollow.
Apart from any profit realized on resale of lots acquired from Copple, Douglas also received payments from Copple, namely, $5,000 on December 20, 1978; $5,000 on April 13, 1979; $7,500 on September 6, 1979; and $15,000 on December 5, 1980. Those payments by personal check of Copple had a total of $32,500. Galter did not share any part of the $32,500 paid by Copple.
On March 14, 1983, Paul Amen, director of the Department of Banking and Finance of the State of Nebraska, received a letter from the Federal Bureau of Investigation implying that there might be irregularities in loans at Commonwealth. Copple's name was not mentioned in the FBI letter to Amen. Douglas received a copy of the FBI letter.
On May 4, 1983, Barry Lake, assistant director of the Department of Banking and Finance, personally met with Douglas at the Attorney General's office to inform Douglas of "evidence of possible crimes that were not mentioned" in the FBI letter. Lake told Douglas about an examination report reflecting Copple's receipt of $500,000 in what appeared to Lake to be an "insider-type transaction" which Lake characterized as "theft."
Lake later pointed out to Ruth Anne Galter, an assistant attorney general assigned by the Attorney General to the Department of Banking and Finance, the two Copple transactions reflected in an examination report on Commonwealth. Ms. Galter "could not characterize them as insider loans," but in July 1983 reported to Douglas the $500,000 Copple "commissions."
*898 On November 1, 1983, Commonwealth was declared insolvent and its doors closed by receivership. Around November 12, 1983, Amen resigned as director of the Department of Banking and Finance, and on November 16, 1983, John P. Miller was appointed interim director of the department.
In his letter of November 18, 1983, Douglas designated David A. Domina as "special counsel to handle all legal matters relating to Commonwealth Savings Company."
Domina, by his letter of November 25, 1983, to Douglas, requested information regarding "any payment received by you as compensation for any service(s) from [Marvin Copple]." There was no reply to Domina's letter before Domina personally interviewed Douglas.
Within a few days after Douglas' receipt of Domina's letter, Douglas, Domina, and Miller met at Douglas' office to "set the ground rules for the taking of Paul's testimony." At that time Douglas stated "he wanted the opportunity of making full disclosure of all his involvement in the matters relating to Commonwealth."
In a transcribed interview with Douglas on November 30, 1983, Domina asked about compensation which Douglas had received from Copple.
Q. ... Were there other developments, then, besides Fox Hollow and Timber Ridge for which you were paid for services as counsel?
A. There was always something coming up, and as it was requiring my time and my counseland I would remind him of it and periodicallyhe would pay me for it....
....
Q. Did you ever specifically bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge?
A. No.
Q. Did you ever give him orally, you know, a figure or ask for a specific amount of compensation on those other projects?
A. No.
Q. How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge or did he?
A. He never did pay me.
During a second transcribed interview by Domina on December 12, 1983, Douglas again discussed his compensation for services to Copple, and informed Domina and Miller that Copple was going to convey a 10-percent interest in Timber Ridge to Galter and Douglas. Such acquisition of the 10-percent interest was not part of the lot-resale plan involving Fox Hollow. In this second interview there was no specific inquiry by Domina regarding compensation other than compensation resulting from the acquisition of real estate interestsFox Hollow and Timber Ridgeand there was no mention of Copple's payment of $32,500 to Douglas.
Upon completion of his investigation Domina, with Miller, prepared a report, the "Miller-Domina report," which was submitted to the Legislature.
After the Miller-Domina report and in his letter of February 6, 1984, to Richard G. Kopf, special counsel for the Special Commonwealth Committee of the Legislature, Douglas stated that Copple was "willing to compensate us for our services by allowing us to participate in the profits of future lot sales." Later, in this letter to Kopf, Douglas stated:
For all those services, I received compensation in the form of reduced price purchases of Fox Hollow lots, money, and a, to date unconveyed, 10% interest in Timber Ridge.... That compensation was paid to me in accordance with the general agreement and understanding between Paul Galter, myself and Marvin Copple.... As indicated, the transaction [resale of lots] was designed to provide compensation to us for our services.
(Emphasis supplied.) Douglas then disputed a profit of $118,288.67 on resale of the lots as alleged by the State, that is, the allegation that Galter and Douglas each received a profit of $59,144.34. Douglas indicated the net profit on resale of the lots was $89,544.22, or a profit of $44,772.11 *899 each for Galter and Douglas. Douglas' letter to Kopf continued:
Although I advised Mr. Domina that Marvin Copple made payments to me from time to time, no one has ever asked me whether or not the only payments I received for my services in connection with all the real estate developments ... were received as profits from the lot sales. Because of the extensive additional work which I did ... I was paid a total of $32,500 during 1978, 1979 and 1980. For more than 1,500 hours of work over a period of five years, I received a total of $77,272.11.
Douglas' letter of February 6 was the first public disclosure of the $32,500 paid by Copple.
At the hearing before the Special Commonwealth Committee of the Legislature on February 24 or 25, 1984, Douglas commented upon the Copple payments of $32,500:
I wish I would have told them about the extra 32 five. I didn't, but that hardly puts me in the role that he [Domina] says that I belong in, but interestingly enough, on his examination of me, he asked me this question: "All right. Were there other developments, then, besides Fox Hollow and Timber Ridge for which you were paid for services as counsel"? That was the question. "Were there other developments besides Fox Hollow and Timber Ridge for which you were paid for services as counsel", and I responded, "There was always something coming up, and it required my time and counsel. I would remind him of it periodically; he would pay me for it". Now, he didn't pursue that. It is quite obvious that I didn't volunteer it, and I should have.
On the nextLater on on that page, he asks the question slightly different, and I played the part of the lawyer and answered his question. Again, I say, I should have told him. "Did you especially bill Mr. Copple for your counsel on these other projects other than Fox Hollow and Timber Ridge"? And the answer was, "No", and that is a correct answer, but I knew what he wanted. "Did you ever give him orally, you know, a figure or ask for a specific amount for compensation on these other projects"? The answer was, "No". "How did he pay you for your services on the project other than Fox Hollow? How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge, or did he"? I answered the first part of the question by saying, "He never did pay me", meaning he never did pay me for projects other than Fox Hollow and Timber Ridge, and I realize that when I got my statement, and one of the first things we talked about, and one of the things that I did in the two-week period of time was to put it in the report, not only put it in that I had gotten paid, but tell you the exact amount of money that I made.
The profit from the resale of lots was produced over a period of almost 3½ years. Galter knew Douglas "had received money from Marvin Copple in connection with other transactions," namely, Timber Ridge. However, Douglas' letter to Kopf was Domina's first knowledge about Copple's payment of $32,500 to Douglas.
"Misrepresentation. Any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.... That which, if accepted, leads the mind to an apprehension of a condition other and different from that which exists." Black's Law Dictionary 903 (5th ed. 1979).
Misrepresentation is any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. See, Pasko v. Trela, 153 Neb. 759, 46 N.W.2d 139 (1951); Caruso v. Moy, 164 Neb. 68, 81 N.W.2d 826 (1957).
Before we determine whether Douglas had a duty to refrain from misrepresentation during Domina's investigation concerning Commonwealth, we must first examine Douglas' status during that investigation. Douglas was the elected Attorney General of the State of Nebraska during the interviews. *900 As Attorney General, Douglas was a public officer holding a position of public trust. Throughout the United States, public officers have been characterized as fiduciaries and trustees charged with honesty and fidelity in administration of their office and execution of their duties. See, Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 86 A.2d 201 (1952); Marshall Impeachment Case, 363 Pa. 326, 69 A.2d 619 (1949); Fuchs v. Bidwill, 31 Ill.App.3d 567, 334 N.E.2d 117 (1975); Williams v. State, 83 Ariz. 34, 315 P.2d 981 (1957); Jersey City v. Hague, 18 N.J. 584, 115 A.2d 8 (1955); In re Removal of Mesenbrink as Sheriff, 211 Minn. 114, 300 N.W. 398 (1941); Matter of Parsons v. Steingut, 185 Misc. 323, 57 N.Y.S.2d 663 (1945); 67 C.J.S. Officers §§ 11, 201 (1978); 63 Am.Jur.2d Public Officers and Employees § 7 (1972).
"Although the general rule is that `one party to a transaction has no duty to disclose material facts to the other,' an exception to this rule is made when the parties are in a fiduciary relationship with each other." Midland Nat. Bank, etc. v. Perranoski, 299 N.W.2d 404, 413 (Minn.1980). When a relationship of trust and confidence exists, the fiduciary has the duty to disclose to the beneficiary of that trust all material facts, and failure to do so constitutes fraud. See 37 C.J.S. Fraud § 16 d. (1943).
"`It is the duty of a trustee to fully inform the cestui que trust [beneficiary] of all facts relating to the subject matter of the trust which come to the knowledge of the trustee and which are material to the cestui que trust to know for the protection of his interests.'" Johnson v. Richards, 155 Neb. 552, 566-67, 52 N.W.2d 737, 746 (1952). See, also, First Trust Co. v. Carlsen, 129 Neb. 118, 261 N.W. 333 (1935); Rettinger v. Pierpont, 145 Neb. 161, 15 N.W.2d 393 (1944).
Where one has a duty to speak but deliberately remains silent, his silence is equivalent to a false representation. See Anderson v. Anderson, 620 S.W.2d 815 (Tex.Civ. App.1981). One standing in the relationship of a trustee to another owes to that other the duty of making a full disclosure of all matters appertaining to the trust, and neglect to do so, when the trustee knows or has good reason to believe that silence will result, is a "fraudulent act." Kauffman v. McLaughlin, 189 Okl. 194, 114 P.2d 929 (1941).
"The failure on the part of one occupying a fiduciary relation to disclose fully and fairly all of the facts to those to whom such duty of disclosure is owed may be regarded as evidence of fraud." Grigg v. Hanna, 283 Mich. 443, 459, 278 N.W. 125, 131 (1938).
Fraud can exist in the absence of a positive false statement. See Krueger v. St. Joseph's Hospital, 305 N.W.2d 18 (N.D. 1981).
[S]uppression of a material fact, which a party is bound in good faith to disclose, is equivalent to a false representation.... Fraud may arise not only from misrepresentation but from concealment as well. For concealment to constitute fraud, there must be suppression of facts which one party has a legal or equitable obligation to communicate to another. One who stands in a confidential or fiduciary relationship to another party must disclose material facts and must reveal enough information to prevent misleading the other party.
Id. at 25. In reference to misrepresentation and fraud, concealment means nondisclosure when a party has a duty to disclose. See Reed v. King, 145 Cal.App.3d 261, 193 Cal.Rptr. 130 (1983). "`Where persons sustain toward [another] a relation of trust and confidence, their silence when they ought to speak ... is as much a fraud in law as an actual affirmative false representation.'" Wade v. Thomasville Orthopedic Clinic, 167 Ga.App. 278, 281, 306 S.E.2d 366, 368 (1983). "The concealment of a fact which one is bound to disclose is an indirect representation that such fact does not exist, and constitutes fraud." 37 C.J.S. Fraud § 16 a. at 245 (1943).
Douglas had appointed Domina to "handle legal matters" relating to Commonwealth. Domina's investigation of the Commonwealth catastrophe necessarily and legitimately included inquiry about the activities *901 of officers and directors of the insolvent company. Because Douglas had a business association with Copple, a director of Commonwealth, the line of inquiry logically led to Douglas. In order to determine and evaluate the precise relationship between Copple and Douglas, Copple's payments to Douglas demanded explanation.
There is no room for doubt that Domina's letter of November 25, 1983, to Douglas and the subsequent interviews of Douglas sought the nature and reason for all compensation which Copple had paid to Douglas. It is true Domina did not ask Douglas the precise question, Were the profits on resale of the lots the only compensation received from Copple regarding real estate developments? Yet, in his testimony before the legislative committee on February 24 (February 25), Douglas said, "[A]nd I played the part of the lawyer and answered his question ... but I knew what he wanted." What was "wanted" was the truth about compensation paid by Copple to Douglas.
As Attorney General, Douglas was responsible to the State of Nebraska and owed loyalty to the people of Nebraska as a trustee of the public interest. Cf. Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (a law enforcement officer's relationship and loyalty to a city or state as an employer).
Douglas' comments before the legislative committee are a positive and unambiguous expression of his mental state during the interviews by Domina, that is, he knew the subject of the inquirycompensation paid by Coppleand recognized that "I should have told" Domina about the $32,500. There could hardly be a more clear-cut acknowledgment of the duty to disclose the information and breach of that duty to speak in response to the public's inquiry. At the time of Domina's inquiry in December 1983, information about payments from Copple was particularly within Douglas' knowledge. As a fiduciary and upon inquiry, Douglas was required to disclose his compensation from Copple. Public trust is not a field on which a public officer can display gamesmanship by playing "the part of the lawyer."
Though one may be under no duty to speak, if he undertakes to do so, he must tell the truth and not suppress facts within his knowledge or materially qualify them. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false.
Johnson v. Richards, 155 Neb. 552, 563, 52 N.W.2d 737, 744 (1952). See, also, State ex rel. Nebraska State Bar Assn. v. Richards, 165 Neb. 80, 84 N.W.2d 136 (1957). "To reveal some information on a subject triggers the duty to reveal all known material facts." Wirth v. Commercial Resources, Inc., 96 N.M. 340, 345, 630 P.2d 292, 297 (1981). "[W]hen a party undertakes to disclose anything, it has the duty to speak the full truth." Issen v. GSC Enterprises, Inc., 538 F.Supp. 745, 751 (N.D.Ill.1982). Even if a party has no duty originally, partial disclosure creates a duty for full disclosure. Ingaharro v. Blanchette, 122 N.H. 54, 440 A.2d 445 (1982). Although a party is under no duty to speak, once the party does speak, that party is required to make a full and fair disclosure concerning the matters discussed. Shaver v. N.C. Monroe Const. Co., 63 N.C. App. 605, 306 S.E.2d 519 (1983).
Thus where one person seeks information from another and expressly states that he will place reliance on the latter's statements, or the circumstances are such that the person approached must know that what he says will be relied on, he may either refuse to give any information or he must make a full and truthful disclosure which shall have no tendency to deceive or mislead.
A duty to speak may arise from partial disclosure, the speaker being under a duty to tell the whole truth although he might have said nothing.
37 C.J.S. § 16 c. Fraud at 247 (1943).
"Although a party may keep absolute silence and violate no rule of law or equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to *902 discover [disclose] the whole truth. A partial statement, then, becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation." Gidney v. Chapple et al., 26 Okl. 737, 753, 110 P. 1099, 1105-06 (1910).
When Douglas gave a rather lengthy, sometimes detailed, but frequently confusing account of the acquisition and disposition of Fox Hollow lots and the prospective 10 percent interest in Timber Ridge as compensation for services to Copple, Douglas was required to reveal all information about his compensation and to make a truthful disclosure regarding his compensation from Copple. During the November 30 interview by Domina, Douglas was questioned: "Q. ... Were there other developments, then, besides Fox Hollow and Timber Ridge for which you were paid for services as counsel? A. There was always something coming up ... he would pay me for it...." And several questions later: "Q. How did he pay you for your services on the projects other than Fox Hollow and Timber Ridge or did he? A. He never did pay me." Douglas' answers about his compensation from Copple were inconsistent and created a substantially false impression during the interviews. Douglas' office as a public trust required correction and elimination of the false impression resulting from the inconsistent answers. We note that the provisions of the Model Penal Code § 241.1(5) at 93 (1980) provide:
Where the defendant made inconsistent statements under oath or equivalent affirmation, both having been made within the period of the statute of limitations, the prosecution may proceed by setting forth the inconsistent statements in a single count alleging in the alternative that one or the other was false and not believed by the defendant. In such case it shall not be necessary for the prosecution to prove which statement was false but only that one or the other was false and not believed by the defendant to be true.
From his comments before the legislative committee, Douglas knew that he had created a false impression during his interviews by Domina. Such conduct by Douglas was a misrepresentation under the circumstances.
Pecuniary loss by the State of Nebraska is not a necessary element of misrepresentation in this case. Cf. Chicago ex rel. Cohen v. Keane, 64 Ill.2d 559, 2 Ill.Dec. 285, 357 N.E.2d 452 (1976) (monetary damage to a governmental entity to which an officer has been elected or appointed is not necessary for a violation of a rule forbidding conflict of interest). Direct financial gain does not have to result from misrepresentation by a public officer. Cf. Miller v. City of Martinez, 28 Cal.App.2d 364, 82 P.2d 519 (1938) (in a conflict of interest, the interest does not have to involve a direct financial gain on the part of a public official; the interest can be anything which would prevent the public official from exercising absolute loyalty and undivided allegiance to the best interest of the government he serves, that is, absolute freedom from any influence other than that which may grow out of the obligation he owes to the public).
We will not speculate on the investigative avenues which might have opened, had the payments of $32,500 been disclosed during the Domina interviews of Douglas. The benefit to Douglas by his misrepresentation was the advantage of time gained outside the focus of public inquiry.
If there is no misrepresentation in the case before us, references to public trust are reduced to political platitudes or rhetoric.
The circumstances in this case raise many unanswered questions about the entire situation involving Copple and Douglas. Nevertheless, based on the evidence before us, we find beyond a reasonable doubt that the misrepresentation by Douglas was willfully done with a corrupt intention. Specifically, we find that Douglas is guilty of specification No. 1 of the articles of impeachment and resolution submitted by the Eighty-eighth Legislature, Second Session, of the State of Nebraska. Therefore, we would find that Paul L. Douglas has committed a misdemeanor in his office *903 as Attorney General of the State of Nebraska.
SHANAHAN and GRANT, Justices and MORAN, District Judge, dissenting.
For the reasons hereinafter stated we dissent from the acquittal on specification No. 2duty not to lie.
The following appear to be the defendant's statements on this specification. The questions are asked by Mr. Domina and the answers are defendant's.
Q. So, the proceeds of the July 20, 1979 sale to Driscoll enabled you to pay off that 1973 note, correct?
A. Yes, that's correct.
Q. Who arranged the sale to Judy Driscoll?
A. Marvin Copple arranged for all the sales.
Q. Did you ever talk to Judy Driscoll about that sale?
A. No.
Q. Do you know where she got the money to pay you off?
A. No. I was led to believe and I think I said earlier to you that Marvin had had a buyer that wanted to buy the lots. And that he would sell it to me, we would make some profit, we would sell it to Judyhe would sell it to me, we would sell it to Judy, Judy would make some profit and then Judy had a buyer and she would make a profit.
....
Q. I want to ask you one other thing relating to the Judy Driscoll purchases. You were fully aware, were you not, that Judy Driscoll had no money with which to buy any property?
A. No, I was not.
Q. Did you ever ask her?
A. No.
Q. Did you negotiate with her?
A. No.
Q. Did you find it unusual that the secretary of a guy who bought your lots, sold you your lots, would buy yours?
A. No, I did not.
Q. Did you ask any questions about that at all?
A. I told you why he explained to me they were going to be sold from me to Judy.
Q. Why would Marvin Copple, who you described as a well-respected, ethical businessman, sell you 12 lots for $105,000 on June 1 and permit you to buy them from his secretary for at least 15 and maybe
A. Sell them to his secretary.
Q. Sell them to his secretary for somewhere between 15 to $30,000 more 50 days later?
This question was never answered.
Q. Now, in any event later on Judy Driscoll then borrowed some money from Commonwealth to buy lots from you, didn't she?
A. You told me that.
Q. Did you know that?
A. I did not know that.
Q. Did Marvin Copple ever tell you that he was going to use Judy Driscoll to borrow money from Commonwealth because he couldn't?
A. No, never.
In his letter response to the Miller-Domina report on February 6, 1984, the defendant stated:
The [Miller-Domina] report indicates that a number of the lots transferred to Judy Driscoll remain unsold and that a substantial balance is due to Commonwealth from Judy Driscoll. We had no knowledge that Commonwealth financed her acquisition of those lots.
The question is clear, Did defendant lie when he said he did not know that Judith Driscoll was being financed by Commonwealth Savings Company when she bought lots from defendant and Paul Galter?
Defendant's connection with Marvin Copple began, so far as this case shows, on December 29, 1973. Defendant borrowed $6,500 from Marvin Copple personally, apparently to buy a car. Marvin Copple assigned defendant's note to Commonwealth on December 29, 1973, "without recourse." Defendant paid some interest on the note, but finally began having the interest added *904 to the note and signing extension notes ranging from 30 days to 1 year, until the Commonwealth note was finally paid off by defendant on August 30, 1979, when defendant paid Commonwealth two checks totaling $8,556.
During the time that this note was unpaid, defendant borrowed $25,000 on December 3, 1976, to repair his home. Defendant's certificate given to Commonwealth on that date stated the money was "for business and commercial purposes; and not for personal, family, household, or agricultural purposes." Defendant stated, however, that this loan was taken out to repair his residence. This note was a signature note and was extended some 15 times. Interest was seldom paid, but was added to the principal at the times of renewal. This note was paid off by defendant by a check in the amount of $54,048.51 on September 7, 1982. This payment was apparently financed by an August 31, 1982, loan of $55,000 from First Security Bank & Trust Co. of Beatrice, Nebraska, an institution owned by Copple family members. The First Security note was then paid by a loan from an outside bank on November 23, 1983.
Aside from these troublesome financial problems, defendant and Paul Galter, prior to 1975, engaged in the commodities market and lost the sum of $40,000, or $20,000 each. Defendant told Paul Galter that he, Douglas, would have to make that money up. Galter told defendant that Marvin Copple was going to start a new development and needed help. The three met, and Copple agreed to take Douglas into the Copple-Galter venture. Galter was to do the legal work, and defendant was to counsel Copple on other details of the development. The arrangement for compensation was described by defendant, in answer to Mr. Domina's questions, as follows:
Q. Then how were you to be paid as a result of that arrangement?
A. The way the contract was originally drawn up he wouldhe would sell us the lots at a hundred dollarsthe original contract that I had with himthat we had with him, that Paul Galter and I had with him listed 26 lots.
Q. All in Fox Hollow?
A. All in Fox Hollow. And there was a set total purchase price of $241,774 for the 26 lots. That was computed on the basis of a hundred dollars per frontal foot for that real estate. And that's in the contract, and I'll give you a copy of the contract. That as he would find a buyer he would give me a deed. I would give the buyer a deed. The buyer would pay me for the purchase of the lot and I would pay Marv Copple forfor that lot. In the contract each lot is not broken down individually, but he did give me a price on every one of the lots so I would know what I paid for each lot for tax purposes, and what the lot was sold for and the difference would be money that Paul Galter and I would jointly get for the sale of the lots which would compensate us for the work that we had done helping Marvin develop those lots.
Q. Was your compensation calculated on a per hour basis or a per transaction basis or how did you know how much you would be paid?
A. I didn't know how muchI had no idea how much I was going to end up making on this except, as I indicated to you, Marvin Copple had led Paul Galter and I to believeand I'm not saying deceivingly, I'm saying he led us to believe that there was a lot of money to be made and always left us with the assurance that we were going to be well compensated for it, and I remember that if he told me once he told us several times along the way as things werewere progressing very well, that our financial worries were over. He had anticipated that the whole transaction would take about two years.
The arrangement for compensation to defendant and Galter began with a purchase agreement executed January 12, 1977, between defendant and Galter, as buyers, and Marvin Copple, as seller. This agreement covered 26 lots for the price of $241,774. The next agreement between the same parties was for 40 lots for $320,755 and was executed on September 8, 1977, and the last agreement was executed on June 1, *905 1979, for 12 lots for $105,600. Exhibit 45 was received in evidence. It is a partial abstract of the title to the 78 lots involved in the three Copple-Douglas transactions during the period relevant to this case.
In the original 26-lot agreement the buyers were to have 120 days interest free, but on April 20, 1977, Copple called defendant and Paul Galter to Copple's office and told them that the purchase agreement had been assigned to Commonwealth and that defendant and Galter should borrow the necessary funds from Commonwealth to pay Copple off. Without objection and pursuant to Copple's direction, on April 20, 1977, defendant signed a 6-month, $241,774 note to Commonwealth (with the rate changed from the printed rate of 11 percent to 8¾ percent). Paul Galter guaranteed this note. A Commonwealth check in that amount was issued to defendant, Galter, and Copple. Defendant and Galter endorsed the check, and Marvin Copple deposited it in his personal account on April 21, 1977. This arrangement was not satisfactory to defendant and Galter because of the interest which would accrue on the Commonwealth note, and defendant stated that he did not want to transact business again with Marvin Copple in this fashion. The relevance of this transaction to later dealings with Judith Driscoll is that defendant certainly knew that in connection with the beginnings of the convoluted compensation plan between Copple and Douglas, money did flow from Commonwealth to Marvin Copple. Defendant executed a mortgage to Commonwealth, but that mortgage was never filed on these 26 lots.
Pursuant to the agreement between Copple, Galter, and Douglas, Copple was to arrange for sales to third parties at a price that would result in a gain to defendant and Galter. Examination of exhibit 45 indicates that 18 of these lots were sold to third persons (i.e., to someone other than Judith Driscoll) at some time.
One lot, although a part of the purchase agreement between Copple and defendant, was sold in September of 1978 directly by Copple to a third party. No explanation is furnished concerning this sale.
Four lots were conveyed by Marvin Copple and his wife to defendant on April 20, 1977 (deed recorded on May 16, 1980), at a total price of $38,500. No evidence is furnished as to defendant's selling of these four lots, but passing reference is made to the lots in the abstract (exhibit 45), and three of the lots ended up titled in Commonwealth Savings Company in 1981. The other lot is shown mortgaged to Commonwealth in 1977.
As to two other lots, exhibit 45 shows nothing, except that those two lots apparently were conveyed from Swails Construction Company to Commonwealth Savings Company by warranty deed in February 1981.
As to the remaining 11 lots of the 18 allegedly sold to third parties, 5 were sold by defendant to third parties by 5 deeds dated in May, August, and October 1977. The five deeds to those lots to defendant from Marvin Copple and his wife were dated a few days before the sale. Judith A. Driscoll was the notary public on all of these deeds to and from defendant. On four of these transactions, according to the revenue stamps, defendant was a mere conduit and made no profit. On one transaction defendant made $2,500. On May 16, 1978, defendant sold three lots on one deed to a third party after getting title from Copple the day before. There was no profit on this transaction. On May 15, 1978, defendant sold three more lots to another purchaser after getting title to these lots 3 days before. There was a $3,000 profit on these lots.
In this connection, defendant stated in his December 12, 1983, statement that he and Galter had bought and sold 10 lots of the original 26 lots in 1977 and that each had a net gain of $5,808. No evidence was furnished in explanation of this difference.
After the disposition of 18 of the 26 lots, 8 lots were left. With regard to these eight lots, all subject to Commonwealth's unrecorded mortgage, on August 28, 1979, defendant sold each of these lots by separate warranty deed to J.A. Driscoll. An individual deed to each lot, dated April 20, *906 1977, from Marvin Copple and his wife to defendant, was recorded on May 16, 1980. (Each of these 16 deeds was acknowledged before W.N. Stevenson, an assistant vice president of Commonwealth.) Ms. Driscoll borrowed $100,500 from Commonwealth on August 28, 1979, deposited this sum in her personal account, and paid Douglas by check on August 30, 1979. Douglas paid Commonwealth the same day, finally closing out defendant's 1977 $241,774 debt to Commonwealth. Each of these eight lots remained titled in J.A. Driscoll's name as of the time of trial, subject to a mortgage, acknowledged before W.N. Stevenson, to Commonwealth in the amount of $100,500.
Next, defendant and Paul Galter entered into a purchase agreement with Marvin Copple on September 8, 1977, to purchase 40 described lots in Fox Hollow Second Addition for a price of $320,755, payable not later than September 8, 1978. Judith Driscoll acknowledged the parties' execution of this agreement.
At the time of this purchase agreement, Marvin E. Copple and his wife had executed (on September 1, 1976) a mortgage covering the entire 40 lots (and probably much more land) to the National Bank of Commerce Trust & Savings Association in the amount of $841,500. So far as the evidence presented to the court shows, this mortgage had not been released as of March 26, 1984, as to the lots in this 40-lot transaction. Paul E. Galter was the notary public who acknowledged this mortgage.
On December 27, 1977, J.A. Driscoll signed a note in the amount of $371,814 to Commonwealth and received from Commonwealth a check in that amount. On the same date, J.A. Driscoll executed a mortgage to Commonwealth in the same amount. This mortgage was never recorded.
The $371,814 Commonwealth check was endorsed by Ms. Driscoll "Pay to the order of P.P.S.S. A Partnership" and deposited by defendant in the P.P.S.S. account on the same day, December 27, 1977. On the same day, defendant signed a P.P.S.S. check in the amount of $320,755 to Marvin E. Copple. This check to Copple was also deposited in his account the same day. At this point, defendant and Paul Galter have made a profit of $51,059 on this 40-lot transaction.
The later history of the 40 lots is interesting. As to 10 of the lots, defendant does not appear in the chain of title. On January 17, 1978, Marvin Copple and his wife conveyed these 10 lots directly to J.A. Driscoll for an indicated price of $70,000. On January 18, 1978, J.A. Driscoll conveyed the same 10 lots to Dwaine and Phyllis E. Andringa for an indicated price of $87,500. Both of these deeds were recorded on January 19, 1978.
The Andringas gave a mortgage to Commonwealth on January 17, 1978, covering these 10 lots plus an additional 20 lots (all in Fox Hollow First or Second Addition, but none involving defendant) in the amount of $290,412. The last indication of activity on these 10 lots is the filing of a notice of lis pendens on November 22, 1982, by Commonwealth Savings Company indicating that the mortgage on the 10 lots (and an additional 15 of the original 20 additional lots) was being foreclosed in the district court for Lancaster County.
With regard to the other 30 of the 40 lots in this grouping, title typically went from Marvin E. Copple and wife to defendant by warranty deeds (there were 10 such deeds) dated December 27, 1977, and recorded May 16, 1980. These deeds would each convey three lots and showed an indicated price of $24,500 for the three lots. Then on December 29, 1977, defendant conveyed the same three lots by warranty deed to J.A. Driscoll at an indicated price of $28,000 (there were 10 of these deeds). W.N. Stevenson, assistant vice president of Commonwealth, was the notary public on these 20 deeds. The deeds to Ms. Driscoll were all recorded on May 30, 1980.
Also typically, in connection with 25 of these 30 lots, J.A. Driscoll, on January 25, 1979, conveyed 2 of the 3 lots as to which she had received a deed from defendant to Lakeshore Marina, Inc. These deeds were all recorded on June 10, 1980. In other words, for each two deeds Ms. Driscoll *907 would get from defendant, she would give three deeds to convey the same six lots. The rationale for this is beyond us to fathom, and we were not favored with any explanatory testimony or evidence from any person connected with the events.
As to these 25 lots, Lakeshore Marina then gave a mortgage to Commonwealth on January 25, 1979, in the amount of $312,000. This mortgage was recorded on January 31, 1979, and was payable on July 25, 1979. On September 7, 1979, Lakeshore Marina gave another mortgage to Commonwealth in the amount of $357,940.98, apparently renewing the earlier mortgage. By deed dated October 21, 1983, Lakeshore Marina, Inc., conveyed the 25 lots to Fox Hollow, Inc. On the same date of October 21, 1982, Fox Hollow gave a deed of trust in the amount of $1,205,565.24 to "S.E. Copple, Real Estate Broker, Trustee and Commonwealth Savings Company Beneficiary" for the 25 lots plus an additional 24 lots in Fox Hollow Second Addition. The additional 24 lots have no connection with defendant.
As to the remaining 5 lots (40 lots minus 10 directly to Driscoll and minus the 25 lots discussed above), those lots were conveyed on the same dates and in the same manner as the other deeds described above, from the Copples to Douglas to Driscoll. Ms. Driscoll then conveyed the five lots by two separate deeds to a third party. The five lots were mortgaged to Commonwealth in recorded mortgages in the amount of $68,302.52. These mortgages remain of record.
It is reasonably clear, then, that all the 40 lots sold from the Copples to defendant to Driscoll during late 1977 ended up mortgaged in one form or another to Commonwealth. It also appears, in the absence of further explanation, from the number of lots involved and the value of the mortgages on them that apparently no building was ever begun on any lot between 1977 and 1983.
The 12-lot transaction began with the execution of a purchase agreement on June 1, 1979, between the same partiesdefendant and Galter, as buyers, and Marvin Copple, as seller. On July 20, 1979, Marvin Copple and his wife, in 4 separate warranty deeds each covering 3 lots, conveyed the 12 lots to defendant. Each deed was acknowledged before Judith A. Driscoll on July 20, 1979. The check to Marvin Copple for these 12 lots was dated July 20, 1979, and was written on the account of P.P.S.S., a partnership, and signed by Paul L. Douglas, in the amount of $105,600.
Also on July 20, 1979 (recorded October 24, 1979), defendant by 1 warranty deed conveyed the 12 lots to J.A. Driscoll for an indicated price of $120,000, showing a gross profit to defendant of $14,400. W.N. Stevenson, an assistant vice president of Commonwealth Savings, was the notary public on this deed.
Also on July 20, 1979, J.A. Driscoll mortgaged the same 12 lots to Commonwealth Savings Company for $132,600.96. This mortgage was also recorded on October 24, 1979. She deposited the Commonwealth money in her personal account, and wrote a check to defendant for $120,000. This check was deposited in this P.P.S.S. account the same day. On the same day, Judith Driscoll wrote a check for $12,600.96 to Marvin Copplethus disposing of the remainder of the $132,600.96 borrowing from Commonwealth. This check indicated it was for "Storm Sewer." There is no evidence showing that defendant had any knowledge of this $12,600.96 payment to Copple. We note, only as an example of bizarre Commonwealth financing, that for lots first sold for $105,600 and resold for $120,000 Judith Driscoll was able to borrow $132,600.96 from Commonwealth on the lotsall on the same date.
These 12 lots, at the time of trial, remained titled in J.A. Driscoll, subject to a mortgage of $132,600.96 to Commonwealth.
The summary, then, of the lot purchase-sale arrangement between Marvin Copple on the one hand and defendant and Paul Galter on the other shows that defendant purchased 78 lots from Copple for the sum of $668,129, and sold those 78 lots for $786,417.67, or a gross profit of $118,288.67. *908 Interest paid to Commonwealth, according to defendant and Paul Galter, reduced the profit to $89,544.22. Defendant sold a total of 78 lots for $786,417.67. Sixty of the 78 lots were sold to Judith Driscoll for $592,314.
From our examination of the evidence presented, there is no direct evidence that defendant knew that Judith Driscoll had borrowed money from Commonwealth to purchase lots from defendant and Paul Galter. There is substantial circumstantial evidence on the question.
The law concerning the manner in which a trier of fact may consider circumstantial evidence is settled in this state. In State v. Buchanan, 210 Neb. 20, 28, 312 N.W.2d 684, 689 (1981), we said: "One accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. The State is not required to disprove every hypothesis but that of guilt."
The defendant's guilt on this specification depends on circumstantial evidence. Direct evidence from which an inference of guilt may be drawn must be considered. It is undisputed that defendant knew Ms. Driscoll was Marvin Copple's secretary; that "Judy answered the telephone, she had a typewriter out there ... that she worked with Marv ..."; and that Ms. Driscoll often acted as notary public taking acknowledgments on deeds from Marvin Copple and his wife to defendant and from defendant to third parties. Defendant did not know if she had a real estate license or "what skills she had" or "what responsibility she had."
It is also shown by documentary evidence, discussed above, that in connection with the 26-lot transaction, defendant himself was required by Marvin Copple to borrow $241,744 from Commonwealth and endorse the very check directly to Marvin Copple. It is also undisputed, from defendant's own statements, that he did not like that arrangement and did not intend to do future business with Marvin Copple in that manner.
Additionally, the documentary evidence shows that on December 27, 1977, Commonwealth issued its check to J.A. Driscoll (admittedly, Judith Driscoll) in the sum of $371,814. This check was endorsed to P.P. S.S., a partnership consisting of defendant and Paul Galter, and deposited by defendant, acting for the partnership, in the partnership account on the same day.
The documentary evidence is conclusive that on the same day defendant deposited the Commonwealth check, defendant himself signed a partnership check to Marvin Copple for $320,755 and a partnership check to State Bank of Colon for $9,691.35. On that same day Paul Galter signed a partnership check to Citibank for $10,487.55, to Union Bank & Trust Company for $11,698.49, and to National Bank of Commerce Trust & Savings for $10,437.85. It is difficult for us to believe that defendant could deposit a check for $371,814, and that immediately defendant and his partner could write checks totaling over $363,000 without knowing the source of the funds on which those checks were issued and that the deposit was good so as to enable large amounts to clear the P.P.S.S. account.
As fact finders, we conclude that defendant knew the $371,814 check was from Commonwealth and that defendant knew Commonwealth was, at least, furnishing interim financing to Judith Driscoll in December of 1977. Defendant had to note and remember a single deposit of more than 10 times his annual income from his position as Attorney General.
Again, from the circumstances presented, when we consider the 40-lot, $371,814 transaction, we note that while defendant sold 30 of the 40 lots to Ms. Driscoll on December 27, 1977, not one of these lots was sold again until January 25, 197913 months later.
Keeping in mind that defendant was constantly furnishing general counseling to Marvin Copple during this time, it is simply unbelievable that defendant was so uncaring of the interests of the developer he was serving that he did not notice that, so far *909 as the lots he sold were concerned, the development was, in fact, not developing.
In his letter to Mr. Kopf the defendant stated that he furnished at least 1,500 hours of nonlegal consultation during a 5-year period. We then note the first of the 1979 transactions. The 12 lots which defendant purchased from Marvin Copple on July 20, 1979, for $105,600 were sold that same day to Ms. Driscoll for $120,000. (This is essentially a 1-day transaction, although the purchase agreement for the lots was signed by defendant on June 1, 1979.) Those 12 lots remained unsold by Judith Driscoll up to the date of trial, and there had been a recorded mortgage to Commonwealth in the amount of $132,600.96 since October 24, 1979. Again, it must be noted that no construction was ever started on any one of these lots, so far as the evidence discloses. It is impossible to believe that a well-paid consultant ($50 per hour is good compensation when one has no overhead) did not notice that no building was taking place on the lots he had sold and wonder how the lot purchaser was servicing the debt incurred in buying and holding undeveloped lots.
The second 1979 transaction must have been of even greater concern to the defendant, as Copple's adviser. Eight lots had been held since April 20, 1977, in defendant's name. As stated above, these 8 lots were part of the original 26-lot transaction. Suddenly, on August 29, 19791 month and 9 days after a $120,000 transaction with Judith Driscolldefendant is afforded an opportunity to dispose of another eight lots to Ms. Driscoll. Defendant received $105,600 from Ms. Driscoll and finally cleared up his 1977 note with Commonwealth.
From the circumstances presented, we find it inconceivable that a well-paid consultant, spending an average 300 hours per year counseling a developer, did not know the nature of the financing that was keeping this venture afloat. It is obvious that financing is the foundation of any property developmentindeed, keeping the lending agency satisfied is, in all probability, the most difficult job the developer has.
In summary, the following evidence is particularly significant in our consideration of this specification:
1. Douglas' rolling over of his unsecured indebtedness and accrued interest to Commonwealth over an extended period of time. While there is evidence that this was not uncommon at Commonwealth, there is no evidence that Douglas knew that.
2. In return for their services Galter and Douglas sold lots in Fox Hollow by contract. They made no downpayments and paid no interest to Copple on the contracts. Copple was to find a purchaser for those lots and negotiate the price. When a purchaser was located by Copple, Douglas would convey the lot to the purchaser, receive the purchase price, pay Copple for the lots, and the profit would be compensation to Douglas and Galter for their services.
3. There were three contracts. The lots in the first contract were mortgaged by Douglas to Commonwealth to pay Copple. Douglas did not want to continue this arrangement. Douglas thereafter sold some of the lots to purchasers located by Copple. Other sales were made by Douglas to Judith Driscoll, Copple's secretary, whom Copple arranged to be the purchaser. She would in turn resell some of the lots. We believe it is significant that Douglas agreed that Ms. Driscoll could be interjected into the sale arrangement as an intermediate purchaser. This decreased his profits to an extent which he did not know, and left him without control over Copple's desires.
4. The first Driscoll purchase from which defendant's knowledge of Driscoll financing may be inferred was by her endorsement of a check from Commonwealth to defendant's partnership. Douglas deposited the check. Other lot purchases by Driscoll from Douglas were by Driscoll's personal check. The sums involved in these transactions were substantial and Driscoll's personal checks were treated as the equivalent of cash.
5. Douglas paid his 1976 Commonwealth house loan on September 7, 1982, with the proceeds of a loan from First *910 Security Bank & Trust Co. of Beatrice (a Copple-related financial institution).
6. Douglas paid the First Security Bank loan on November 25, 1983, after Commonwealth was in receivership.
7. Douglas was the elected Attorney General of the State of Nebraska. He was described by Roger Beverage, a legal acquaintance and the director of the Department of Banking and Finance at the time of trial, as a good lawyer with an ability to "perceive and grasp."
Douglas did not testify. As the triers of fact, we are not bound to accept as true any testimony relating to his out-of-court statements. In particular we are free to reject those exculpatory statements made by Douglas purporting to explain or justify his conduct. See Truman v. State, 153 Neb. 247, 44 N.W.2d 317 (1950).
The issue is what did Douglas mean when he said he did not "know" or had no "knowledge." We were not favored with his testimony in that respect. In Hancock v. State ex rel. Real Estate Comm., 213 Neb. 807, 811-12, 331 N.W.2d 526, 529-30 (1983), the court, in a proceeding dealing with revocation of a real estate broker's license, discussed the words "know" or "knowingly" in a penal statute:
In light of these rules of construction, we turn to the meaning of the word "know" as used in the statute under consideration. The meaning of the word "know" or "knowingly" in a penal statute varies in the context in which it is used. R.D. Lowrance, Inc. v. Peterson, 185 Neb. 679, 178 N.W.2d 277 (1970). We have considered a number of penal statutes in which the word is used with respect to the actions of others or of facts not in the actual knowledge of the person to whom the statute is applied. A statute making it an offense to leave the scene of an accident "knowing" that injury has resulted to another had been held to mean actual, not constructive, knowledge, or such notice as would put one on inquiry, and more than mere negligence in failing to know, or the mere presence of facts which might have induced belief in the mind of a reasonable person. State v. Dougherty, 358 Mo. 734, 216 S.W.2d 467 (1949). A statute making it a crime to "knowingly" receive stolen goods has been held to require a person to have such information from facts which should convince him that the property was stolen, or which should lead a reasonable man to believe they have been stolen, before, in a legal sense, he knew they were stolen. Pettus v. State, 200 Miss. 397, 27 So.2d 536 (1946). See, also, Bennett v. State, 211 So.2d 520 (Miss. 1968). A statute making it unlawful for a person to "knowingly" deliver liquor intended for sale in a dry territory has been held to require such person to have such information as would cause a person of ordinary prudence to believe the liquor was to be so sold, before being liable under the statute. American Express Co. v. Commonwealth, 171 Ky. 1, 186 S.W. 887 (1916). In Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court was considering offenses involving the "knowing" transportation of marijuana, and in footnote 93 of the opinion it accepted the Model Penal Code definition of knowledge: "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." Id. at 46 [89 S.Ct. at 1553].
Comment 9 to § 2.02 of the Model Penal Code referred to in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), states:
Paragraph (7) deals with the situation British commentators have denominated "wilful blindness" or "connivance," the case of the actor who is aware of the probable existence of a material fact but does not satisfy himself that it does not in fact exist. See Edwards, The Criminal Degrees of Knowledge 17 Modern L.Rev. 294 (1954); Williams, Criminal Law § 41. Whether such cases should be viewed as instances of acting recklessly or knowingly presents a subtle but important question.

*911 The draft proposes that the case be viewed as one of acting knowingly when what is involved is a matter of existing fact, but not when what is involved is the result of the defendant's conduct, necessarily a matter of the future at the time of acting. The position reflects what we believe to be the normal policy of criminal enactments which rest liability on acting "knowingly," as is so commonly done. The inference of "knowledge" of an existing fact is usually drawn from proof of notice of substantial probability of its existence, unless the defendant establishes an honest, contrary belief. The draft solidifies this usual result and clarifies the term in which the issue is submitted to the jury.
Model Penal Code § 202, Comment 9 at 129-30 (Tent. Draft No. 4, 1975).
Douglas seems to contend that the words "know" or "knowledge" mean actual or direct knowledge in the sense of actual perception, and concludes that there is insufficient evidence that he had actual or direct knowledge that Driscoll was financing the purchase of lots through Commonwealth.
Even if we accept that meaning and attribute it to Douglas' state of mind, there is sufficient evidence to find beyond a reasonable doubt that Douglas did know that Driscoll was financing her purchase of the lots through Commonwealth. But we adopt the broader meaning of "know" or "knowledge" and conclude that the evidence is almost overwhelming that Douglas was willfully blind or willfully abstained from ascertaining the facts, and thus "knew" or had "knowledge" of the financing arrangement.
Douglas had a number of inducements not to disclose the facts. These have been discussed above. Domina had asked Douglas and other state officials in a letter dated November 18, 1983, to disclose in detail, by letter to him, all financial transactions they had had with Marvin Copple and others. He did not disclose that information in the manner requested. Douglas never wrote such a letter. Had he disclosed all that Domina requested, the very things the record shows he was so reluctant to disclose would have come to light, to his embarrassment.
If Douglas did lie as charged, he did so while in office. If, under State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893), gross negligence in office done corruptly is an impeachable offense, a lie is certainly a corrupt act and is more than negligence.
As noted in the dissenting opinion on specification No. 1, we determine that defendant's conduct in so lying is a clear breach of his fiduciary duty to the people of the State of Nebraska requiring him, as Attorney General, to be honest in his official actions.
We further find that defendant has violated the provisions of Neb.Rev.Stat. § 28-901 (Reissue 1979), which provides in pertinent part:
(1) A person commits the offense of obstructing government operations if he intentionally obstructs, impairs, or perverts the administration of law or other governmental functions by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act ....
Defendant would have us believe that the "obstruction" to be actionable must be "by force, violence, physical interference or obstacle." Defendant thus raises the picture that the Attorney General of our state may criminally obstruct government operations only if he seizes a rifle and keeps duly appointed officials from discovering relevant information. We refuse to construe that statute in so narrow a fashion. We determine the matter on a much more fundamental basisthat the elected Attorney General of this state breached his official duty to be truthful during an official investigation and that he thus obstructed government operations.
We would find defendant guilty of specification No. 2.
HASTINGS, Justice, concurring.
I concur in the opinion of the court as to specification No. 2 which finds that the *912 State failed to prove beyond a reasonable doubt that the defendant lied concerning his knowledge of the loan to Judith Driscoll. I do not agree that the alleged charge amounted to only a technical violation. I also believe that at no point during this investigation was Douglas entitled to respond to questions with less than the whole truth.